Opinion for the court filed by Circuit Judge RANDOLPH.
Dissenting opinion filed by Circuit Judge ROGERS.
RANDOLPH, Circuit Judge.
Do federal courts have jurisdiction over petitions for writs of habeas corpus filed by aliens captured abroad and detained as enemy combatants at the Guantanamo Bay Naval Base in Cuba? The question has been the recurring subject of legislation and litigation. In these consolidated appeals, foreign nationals held at Guantanamo filed petitions for writs of habeas corpus alleging violations of the Constitution, treaties, statutes, regulations, the common law, and the law of nations. Some detainees also raised non-habeas claims under the federal question statute, 28 U.S.C. § 1331, and the Alien Tort Act, id. § 1350. In the “Al Odah” cases (Nos. 05-5064, 05-5095 through 05-5116), which consist of eleven cases involving fifty-six detainees, Judge Green denied the government’s motion to dismiss with respect to the claims arising from alleged violations of the Fifth Amendment’s Due Process Clause and the Third Geneva Convention, but dismissed all other claims. See In re Guantanamo Detainee Cases, 355 F.Supp.2d 443 (D.D.C. 2005). After Judge Green certified the order for interlocutory appeal under 28 U.S.C. § 1292(b), the government appealed and the detainees cross-appealed. In the “Boumediene” cases (Nos. 05-5062 and 05-5063) — two cases involving seven detainees — Judge Leon granted the government’s motion and dismissed the cases in their entirety. See Khalid v. Bush, 355 F.Supp.2d 311 (D.D.C.2005).
In the two years since the district court’s decisions the law has undergone several changes. As a result, we have had two oral arguments and four rounds of briefing in these cases during that period. The developments that have brought us to this point are as follows.
In Al Odah v. United States, 321 F.3d 1134 (D.C.Cir.2003), rev’d sub nom. Rasul v. Bush, 542 U.S. 466, 124 S.Ct. 2686, 159 L.Ed.2d 548 (2004), we affirmed the district court’s dismissal of various claims — habeas and non-habeas — raised by Guantanamo detainees. With respect to the habeas claims, we held that “no court in this country has jurisdiction to grant habeas relief, under 28 U.S.C. § 2241, to the Guantanamo detainees.” 321 F.3d at 1141. The habeas statute then stated that “Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions.” 28 U.S.C. § 2241(a) (2004). Because Guantanamo Bay was not part of the sovereign territory of the United States, but rather land the United States leases from Cuba, see Al Odah, 321 F.3d at 1142-43, we determined it was not within the “respective jurisdictions” of the district court or any other court in the United States. We therefore held that § 2241 did not provide statutory jurisdiction to consider habeas relief for any alien — enemy or not — held at Guantanamo. Id. at 1141. Regarding the non-habeas claims, we noted that “ ‘the privilege of litigation’ does not extend to aliens in military custody who have no presence in ‘any territory over which the United States is sovereign,’ ” id. at 1144 (quoting Johnson v. Eisentrager, 339 U.S. 763, 777-78, 70 S.Ct. 936, 94 L.Ed. 1255 (1950)), and held that the district court properly dismissed those claims.
The Supreme Court reversed in Rasul v. Bush, 542 U.S. 466, 124 S.Ct. 2686, 159 L.Ed.2d 548 (2004), holding that the habe- *985 as statute extended to aliens at Guantanamo. Although the detainees themselves were beyond the district court’s jurisdiction, the Court determined that the district court’s jurisdiction over the detainees’ custodians was sufficient to provide subject-matter jurisdiction under § 2241. See Rasul, 542 U.S. at 483-84, 124 S.Ct. 2686. The Court further held that the district court had jurisdiction over the detainees’ non-habeas claims because nothing in the federal question statute or the Alien Tort Act categorically excluded aliens outside the United States from bringing such claims. See Rasul, 542 U.S. at 484-85, 124 S.Ct. 2686. The Court remanded the cases to us, and we remanded them to the district court.
In the meantime Congress responded with the Detainee Treatment Act of 2005, Pub.L. No. 109-148, 119 Stat. 2680 (2005) (DTA), which the President signed into law on December 30, 2005. The DTA added a subsection (e) to the habeas statute. This new provision stated that, “[ejxcept as provided in section 1005 of the [DTA], no court, justice, or judge” may exercise jurisdiction over
(1) an application for a writ of habeas corpus filed by or on behalf of an alien detained by the Department of Defense at Guantanamo Bay, Cuba; or
(2) any other action against the United States or its agents relating to any aspect of the detention by the Department of Defense of an alien at Guantanamo Bay, Cuba, who
(A) is currently in military custody; or
(B) has been determined by the United States Court of Appeals for the District of Columbia Circuit ... to have been properly detained as an enemy combatant.
DTA § 1005(e)(1) (internal quotation marks omitted). The “except as provided” referred to subsections (e)(2) and (e)(3) of section 1005 of the DTA, which provided for exclusive judicial review of Combatant Status Review Tribunal determinations and military commission decisions in the D.C. Circuit. See DTA § 1005(e)(2), (e)(3). The following June, the Supreme Court decided Hamdan v. Rumsfeld, — U.S. -, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006). Among other things, the Court held that the DTA did not strip federal courts of jurisdiction over habeas cases pending at the time of the DTA’s enactment. The Court pointed to a provision of the DTA stating that subsections (e)(2) and (e)(3) of section 1005 “shall apply with respect to any claim ... that is pending on or after the date of the enactment of this Act.” DTA § 1005(h). In contrast, no provision of the DTA stated whether subsection (e)(1) applied to pending cases. Finding that Congress “chose not to so provide ... after having been presented with the option,” the Court concluded “[t]he omission [wa]s an integral part of the statutory scheme.” Hamdan, 126 S.Ct. at 2769.
In response to Hamdan, Congress passed the Military Commissions Act of 2006, Pub.L. No. 109-366, 120 Stat. 2600 (2006)(MCA), which the President signed into law on October 17, 2006. Section 7 of the MCA is entitled “Habeas Corpus Matters.” In subsection (a), Congress again amended § 2241(e). The new amendment reads:
(1) No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.
(2) Except as provided in [section 1005(e)(2) and (e)(3) of the DTA], no court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its *986 agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.
MCA § 7(a) (internal quotation marks omitted). Subsection (b) states:
The amendment made by subsection (a) shall take effect on the date of the enactment of this Act, and shall apply to all cases, without exception, pending on or after the date of the enactment of this Act which relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien detained by the United States since September 11, 2001.
MCA § 7(b) (emphasis added).
The first question is whether the MCA applies to the detainees’ habeas petitions. If the MCA does apply, the second question is whether the statute is an unconstitutional suspension of the writ of habeas corpus.[1]
I.
As to the application of the MCA to these lawsuits, section 7(b) states that the amendment to the habeas corpus statute, 28 U.S.C. § 2241(e), “shall apply to all cases, without exception, pending on or after the date of the enactment” that relate to certain subjects. The detainees’ lawsuits fall within the subject matter covered by the amended § 2241(e); each case relates to an “aspect” of detention and each deals with the detention of an “alien” after September 11, 2001. The MCA brings all such “cases, without exception” within the new law.
Everyone who has followed the interaction between Congress and the Supreme Court knows full well that one of the primary purposes of the MCA was to overrule Hamdan,[2] Everyone, that is, except *987 the detainees. Their cases, they argue, are not covered. The arguments are creative but not cogent. To accept them would be to defy the will of Congress. Section 7(b) could not be clearer. It states that “the amendment made by subsection (a)” — which repeals habeas jurisdiction— applies to “all cases, without exception” relating to any aspect of detention. It is almost as if the proponents of these words were slamming their fists on the table shouting “When we say ‘all,’ we mean all— without exception!”[3]
The detainees of course do not see it that way. They say Congress should have expressly stated in section 7(b) that habeas cases were included among “all cases, without exception, pending on or after” the MCA became law. Otherwise, the MCA does not represent an “unambiguous statutory direetive[]” to repeal habeas corpus jurisdiction. INS v. St. Cyr, 533 U.S. 289, 299, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001). This is nonsense. Section 7(b) specifies the effective date of section 7(a). The detainees’ argument means that Congress, in amending the habeas statute (28 U.S.C. § 2241), specified an effective date only for non-habeas cases. Of course Congress did nothing of the sort. Habeas cases are simply a subset of cases dealing with detention. See, e.g., Preiser v. Rodriguez, 411 U.S. 475, 484, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973).[4] Congress did not have to say that “the amendment made by subsection (a)” — which already expressly includes habeas cases — shall take effect on the date of enactment and shall apply to “all cases, without exception, including ha-beas cases.” The St. Cyr rule of interpretation the detainees invoke demands clarity, not redundancy.
The detainees also ask us to compare the language of section 7(b) to that of section 3 of the MCA. Section 3, entitled “Military Commissions,” creates jurisdiction in the D.C. Circuit for review of military commission decisions, see 10 U.S.C. § 950g. It then adds 10 U.S.C. § 950j, which deals with the finality of military commission decisions. Section 950j strips federal courts of jurisdiction over any pending or future cases that would involve review of such decisions:
Except as otherwise provided in this chapter and notwithstanding any other provision of law (including section 2211 of title 28 or any other habeas corpus provision), no court, justice, or judge shall have jurisdiction to hear or consider any claim or cause of action whatsoever, including any action pending on or filed after the date of the enactment of the Military Commissions Act of 2006, relating to the prosecution, trial, or judgment of a military commission under this chapter, including challenges to the lawfulness of procedures of military commissions under this chapter.
10 U.S.C. § 950j(b) (emphasis added). The detainees maintain that § 950j calls *988 into question Congress’s intention to apply section 7(b) to pending habeas cases.
The argument goes nowhere. Section 7(b), read in conjunction with section 7(a), is no less explicit than § 950j. Section 7(a) strips jurisdiction over detainee cases, including habeas cases, and section 7(b) makes section 7(a) applicable to pending cases. Section 950j accomplishes the same thing, but in one sentence. A drafting decision to separate section 7 into two subsections — one addressing the scope of the jurisdictional bar, the other addressing how the bar applies to pending cases'— makes no legal difference.[5]
II.
This brings us to the constitutional issue: whether the MCA, in depriving the courts of jurisdiction over the detainees’ habeas petitions, violates the Suspension Clause of the Constitution, U.S. Const, art. I, § 9, cl. 2, which states that “The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.”
The Supreme Court has stated the Suspension Clause protects the writ “as it existed in 1789,” when the first Judiciary Act created the federal courts and granted jurisdiction to issue writs of habeas corpus. St. Cyr, 533 U.S. at 301, 121 S.Ct. 2271; cf. Henry J. Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 170 (1970). The detainees rely mainly on three cases to claim that in 1789 the privilege of the writ extended to aliens outside the sovereign’s territory. In Lockington’s Case, Bright. (N.P.) 269 (Pa.1813), a British resident of Philadelphia had been imprisoned after failing to comply with a federal marshal’s order to relocate. The War of 1812 made Lockington an “enemy alien” under the Alien Enemies Act of 1798. Although he lost on the merits of his petition for habeas corpus before the Pennsylvania Supreme Court, two of three Pennsylvania justices held that he was entitled to review of his detention.[6] In The Case of Three Spanish Sailors, 96 Eng. Rep. 775 (C.P.1779), three Spanish seamen had boarded a merchant vessel bound for England with a promise of wages on arrival. After arriving in England, the English captain refused to pay their wages and turned them over to a warship as prisoners *989 of war. The King’s Bench denied the sailors’ petitions because they were “alien enemies and prisoners of war, and therefore not entitled to any of the privileges of Englishmen; much less to be set at liberty on a habeas corpus.” Id. at 776. The detainees claim that, as in Lockington’s Case, the King’s Bench exercised jurisdiction and reached the merits. The third case — Rex v. Schiever, 97 Eng. Rep. 551 (K.B.1759) — involved a citizen of Sweden intent on entering the English merchant trade. While at sea on an English merchant’s ship, a French privateer took Schiever along with the rest of the crew as prisoners, transferred the crew to another French ship, and let the English prisoners go free. An English ship thereafter captured the French ship and its crew, and carried them to Liverpool where Schiever was imprisoned. From Liverpool Schiever petitioned for habeas corpus, claiming he was a citizen of Sweden and only by force entered the service of the French. The court denied him relief because it found ample evidence that he was a prisoner of war. Id. at 552.
None of these cases involved an alien outside the territory of the sovereign. Lockington was a resident of Philadelphia. And the three Spanish sailors and Schiever were all held within English sovereign territory.[7] The detainees cite no case and no historical treatise showing that the English common law writ of habeas corpus extended to aliens beyond the Crown’s dominions. Our review shows the contrary. See William F. DuiceR, A CONSTITUTIONAL HistoRY of Habeas Coepus 53 (1980); 9 William Holdsworth, A History of English Law 116-17, 124 (1982 ed.); 3 Blackstone, Commentaries 131 (1768); see also 1 Op. Att’y Gen. 47 (1794); In re Ning Yi-Ching, 56 T.L.R. 3, 5 (Vacation Ct.1939) (noting prior judge “had listened in vain for a case in which the writ of habeas corpus had issued in respect of a foreigner detained in a part of the world which was not a part of the King’s dominions or realm”). Robert Chambers, the successor to Blackstone at Oxford, wrote in his lectures that the writ of habeas corpus extended only to the King’s dominions. 2 Robert Chambers, A Course of Lectures on the English Law Delivered at Oxford 1767-1773 (composed in association with Samuel Johnson), at 7-8 (Thomas M. Curley ed., 1986). Chambers cited Rex v. Coivle, 97 Eng. Rep. (2 Burr.) 587 (K.B.1759), in which Lord Mansfield stated that “[t]o foreign dominions ... this Court has no power to send any writ of any kind. We cannot send a habeas corpus to Scotland, or to the electorate; but to Ireland, the Isle of Man, the plantations [American colonies] ... we may.” Every territory that Mansfield, Blackstone, and Chambers cited as a jurisdiction to which the writ extended (e.g., Ireland, the Isle of Man, the colonies, the Cinque Ports, and Wales) was a sovereign territory of the Crown.
When agents of the Crown detained prisoners outside the Crown’s dominions, it was understood that they were outside the jurisdiction of the writ. See Holds-worth, supra, at 116-17. Even British citizens imprisoned in “remote islands, garrisons, and other places” were “prevented] from the benefit of the law,” 2 Henry Hallam, The Constitutional History of England 127-28 (William S. Hein Co.1989) (1827), which included access to habeas corpus, see Duicer, supra, at 51-53; *990 HoldswoRth, supra, at 116; see also Johan Steyn, Guantanamo Bay: The Legal Black Hole, 53 Int’l & Comp. L.Q. 1, 8 (2004) (“the writ of habeas corpus would not be available” in “remote islands, garrisons, and other places” (internal quotation marks omitted)). Compliance with a writ from overseas was also completely impractical given the habeas law at the time. In Cowle, Lord Mansfield explained that even in the far off territories “annexed to the Crown,” the Court would not send the writ, “notwithstanding the power.” 97 Eng. Rep. at 600. This is doubtless because of the Habeas Corpus Act of 1679. The great innovation of this statute was in setting time limits for producing the prisoner and imposing fines on the custodian if those limits were not met. See CHAMBERS, supra, at 11. For a prisoner detained over 100 miles from the court, the detaining officer had twenty days after receiving the writ to produce the body before the court. See id. If he did not produce the body, he incurred a fine. One can easily imagine the practical problems this would have entailed if the writ had run outside the sovereign territory of the Crown and reached British soldiers holding foreign prisoners in overseas conflicts, such as the War of 1812. The short of the matter is that given the history of the writ in England prior to the founding, habeas corpus would not have been available in 1789 to aliens without presence or property within the United States.
Johnson v. Eisentrager, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950), ends any doubt about the scope of common law ha-beas. ‘We are cited to no instance where a court, in this or any other country where the writ is known, has issued it on behalf of an alien enemy who, at no relevant time and in no stage of his captivity, has been within its territorial jurisdiction. Nothing in the text of the Constitution extends such a right, nor does anything in our statutes.” Id. at 768, 70 S.Ct. 936; see also Note, Habeas Corpus Protection Against Illegal Extraterritorial Detention, 51 Colum. L. Rev. 368, 368 (1951). The detainees claim they are in a different position than the prisoners in Eisentrager, and that this difference is material for purposes of common law habeas.[8] They point to dicta in Rasul, 542 U.S. at 481-82, 124 S.Ct. 2686, in which the Court discussed English habeas cases and the “historical reach of the writ.” Rasul refers to several English and American cases involving varying combinations of territories of the Crown and relationships between the petitioner and the country in which the writ was sought. See id. But as Judge Robertson found in Hamdan, “[n]ot one of the cases mentioned in Rasul held that an alien captured abroad and detained outside the United States — or in ‘territory over which the United States exercises exclusive jurisdiction and control,’ Rasul, 542 U.S. at 475, 124 S.Ct. 2686 — had a common law or constitutionally protected right to the writ of habeas corpus.” Hamdan v. Rumsfeld, 464 F.Supp.2d 9, 17 (D.D.C. 2006). Justice Scalia made the same point in his Rasul dissent, see Rasul, 542 U.S. at 502-05 & n. 5, 124 S.Ct. 2686 (Scalia, J., dissenting) (noting the absence of “a single case holding that aliens held outside the territory of the sovereign were within reach of the writ”), and the dissent acknowledges it here, see Dissent at 1000. We are aware of no case prior to 1789 going the detainees’ way,[9] and we are con *991 vinced that the writ in 1789 would not have been available to aliens held at an overseas military base leased from a foreign government.
The detainees encounter another difficulty with their Suspension Clause claim. Precedent in this court and the Supreme Court holds that the Constitution does not confer rights on aliens without property or presence within the United States. As we explained in Al Odah, 321 F.3d at 1140-41, the controlling case is Johnson v. Eisentrager. There twenty-one German nationals confined in custody of the U.S. Army in Germany filed habeas corpus petitions. Although the German prisoners alleged they were civilian agents of the German government, a military commission convicted them of war crimes arising from military activity against the United States in China after Germany’s surrender. They claimed their convictions and imprisonment violated various constitutional provisions and the Geneva Conventions. The Supreme Court rejected the proposition “that the Fifth Amendment confers rights upon all persons, whatever their nationality, wherever they are located and whatever their offenses,” 339 U.S. at 783, 70 S.Ct. 936. The Court continued: “If the Fifth Amendment confers its rights on all the world ... [it] would mean that during military occupation irreconcilable enemy elements, guerrilla fighters, and ‘werewolves’ could require the American Judiciary to assure them freedoms of speech, press, and assembly as in the First Amendment, right to bear arms as in the Second, security against ‘unreasonable’ searches and seizures as in the Fourth, as well as rights to jury trial as in the Fifth and Sixth Amendments.” Id. at 784, 70 S.Ct. 936. (Shortly before Germany’s surrender, the Nazis began training covert forces called “werewolves” to conduct terrorist activities during the Allied occupation. See http://www. archives.gov/iwg/ declassified_rec-ords/oss_records_263_wil-helm_hoettl.html.)
Later Supreme Court decisions have followed Eisentrager. In 1990, for instance, the Court stated that Eisentrager “rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States.” United States v. Verdugo-Urquidez, 494 U.S. 259, 269, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990). After describing the facts of Eisentrager and quoting from the opinion, the Court concluded that with respect to aliens, “our rejection of extraterritorial application of the Fifth Amendment was emphatic.” Id. By analogy, the Court held that the Fourth Amendment did not protect nonresident aliens against unreasonable searches or seizures conducted outside the sovereign territory of the United States. Id. at 274-75, 110 S.Ct. 1056. Citing Eisentrager again, the Court explained that to extend the Fourth Amendment to aliens abroad “would have significant and deleterious consequences for the United States in conducting activities beyond its boundaries,” particularly since the government “frequently employs Armed Forces outside this country,” id. at 273, 110 S.Ct. 1056. A decade after Verdugo-Urquidez, the Court — again citing Eisentrager— found it “well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders.” *992 Zadvydas v. Davis, 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001).[10]
Any distinction between the naval base at Guantanamo Bay and the prison in Landsberg, Germany, where the petitioners in Eisentrager were held, is immaterial to the application of the Suspension Clause. The United States occupies the Guantanamo Bay Naval Base under an indefinite lease it entered into in 1903. See Al Odah, 321 F.3d at 1142. The text of the lease and decisions of circuit courts and the Supreme Court all make clear that Cuba — not the United States — has sovereignty over Guantanamo Bay. See Vermilya-Broum, Co. v. Connell, 335 U.S. 377, 381, 69 S.Ct. 140, 93 L.Ed. 76 (1948); Cuban Am. Bar Ass’n v. Christopher, 43 F.3d 1412 (11th Cir.1995). The “determination of sovereignty over an area,” the Supreme Court has held, “is for the legislative and executive departments.” Vennilya-Brown, 335 U.S. at 380, 69 S.Ct. 140. Here the political departments have firmly and clearly spoken: “ ‘United States,’ when used in a geographic sense ... does not include the United States Naval Station, Guantanamo Bay, Cuba.” DTA § 1005(g).
The detainees cite the Insular Cases in which “fundamental personal rights” extended to U.S. territories. See Balzac v. Porto Rico, 258 U.S. 298, 312-13, 42 S.Ct. 343, 66 L.Ed. 627 (1922); Dorr v. United States, 195 U.S. 138, 148, 24 S.Ct. 808, 49 L.Ed. 128 (1904); see also Ralpho v. Bell, 569 F.2d 607 (D.C.Cir.1977). But in each of those cases, Congress had exercised its power under Article IV, Section 3 of the Constitution to regulate “Territory or other Property belonging to the United States,” U.S. Const., art. TV, § 3, cl. 2. These cases do not establish anything regarding the sort of de facto sovereignty the detainees say exists at Guantanamo. Here Congress and the President have specifically disclaimed the sort of territorial jurisdiction they asserted in Puerto Rico, the Philippines, and Guam.
Precedent in this circuit also forecloses the detainees’ claims to constitutional rights. In Harbury v. Deutch, 233 F.3d 596, 604 (D.C.Cir.2000), rev’d on other grounds sub nom. Christopher v. Harbury, 536 U.S. 403, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), we quoted extensively from Verdugo-Urquidez and held that the Court’s description of Eisentrager was “firm and considered dicta that binds this court.” Other decisions of this court are firmer still. Citing Eisentrager, we held in Pauling v. McElroy, 278 F.2d 252, 254 n. 3 (D.C.Cir.1960) (per curiam), that “nonresident aliens ... plainly cannot appeal to the protection of the Constitution or laws of the United States.” The law of this circuit is that a “foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise.” People’s Mojahedin Org. of Iran v. U.S. Dep’t of State, 182 F.3d 17, 22 (D.C.Cir.1999); see also 32 County Sovereignty Comm. v. U.S. Dep’t of State, 292 F.3d 797, 799 (D.C.Cir.2002).[11]
*993 As against this line of authority, the dissent offers the distinction that the Suspension Clause is a limitation on congressional power rather than a constitutional right. But this is no distinction at all. Constitutional rights are rights against the government and, as such, are restrictions on governmental power. See H.P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 534, 69 S.Ct. 657, 93 L.Ed. 865 (1949) (“Even the Bill of Rights amendments were framed only as a limitation upon the powers of Congress.”).[12] Consider the First Amendment. (In contrasting the Suspension Clause with provisions in the Bill of Rights, see Dissent at 995-96, the dissent is careful to ignore the First Amendment.) Like the Suspension Clause, the First Amendment is framed as a limitation on Congress: “Congress shall make no law .... ” Yet no one would deny that the First Amendment protects the rights to free speech and religion and assembly.
The dissent’s other arguments are also filled with holes. It is enough to point out three of the larger ones.
There is the notion that the Suspension Clause is different from the Fourth, Fifth, and Sixth Amendments because it does not mention individuals and those amendments do (respectively, “people,” “person,” and “the accused”). See Dissent at 996. Why the dissent thinks this is significant eludes us. Is the point that if a provision does not mention individuals there is no constitutional right? That cannot be right. The First Amendment’s guarantees of freedom of speech and free exercise of religion do not mention individuals; nor does the Eighth Amendment’s prohibition on cruel and unusual punishment or the Seventh Amendment’s guarantee of a civil jury. Of course it is fair to assume that these provisions apply to individuals, just as it is fair to assume that petitions for writs of habe-as corpus are filed by individuals.
The dissent also looks to the Bill of Attainder and Ex Post Facto Clauses, both located next to the Suspension Clause in Article I, Section 9. We do not understand what the dissent is trying to make of this juxtaposition. The citation to United States v. Lovett, 328 U.S. 303, 106 Ct.Cl. 856, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946), is particularly baffling. Lovett held only that the Bill of Attainder Clause was justicia-ble. The dissent’s point cannot be that the Bill of Attainder Clause and the Ex Post Facto Clause do not protect individual rights. Numerous courts have held the opposite.[13] “The fact that the Suspension Clause abuts the prohibitions on bills of attainder and ex post facto laws, provisions well-accepted to protect individual liberty, further supports viewing the habeas privilege as a core individual right.” Amanda L. Tyler, Is Suspension a Political Ques *994 tion?, 59 StaN. L. Rev. 333, 374 & n.227 (2006) (emphasis added).[14]
Why is the dissent so fixated on how to characterize the Suspension Clause? The unstated assumption must be that the reasoning of our decisions and the Supreme Court’s in denying constitutional rights to aliens outside the United States would not apply if a constitutional provision could be characterized as protecting something other than a “right.” On this theory, for example, aliens outside the United States are entitled to the protection of the Separation of Powers because they have no individual rights under the Separation of Powers. Where the dissent gets this strange idea is a mystery, as is the reasoning behind it.
III.
Federal courts have no jurisdiction in these cases. In supplemental briefing after enactment of the DTA, the government asked us not only to decide the habeas jurisdiction question, but also to review the merits of the detainees’ designation as enemy combatants by their Combatant Status Review Tribunals. See DTA § 1005(e)(2).[15] The detainees objected to converting their habeas appeals to appeals from their Tribunals. In briefs filed after the DTA became law and after the Supreme Court decided Hamdan, they argued that we were without authority to do so.[16] Even if we have authority to convert the habeas appeals over the petitioners’ objections, the record does not have sufficient information to perform the review the DTA allows. Our only recourse is to vacate the district courts’ decisions and dismiss the cases for lack of jurisdiction.

So ordered.

. Section 7(a) of the MCA eliminates jurisdiction over non-habeas claims by aliens detained as enemy combatants. That alone is sufficient to require dismissal even of pending non-habeas claims. See Bruner v. United States, 343 U.S. 112, 116-17, 72 S.Ct. 581, 96 L.Ed. 786 (1952). Section 7(b) reinforces this result.

. Without exception, both the proponents and opponents of section 7 understood the provision to eliminate habeas jurisdiction over pending cases. See, e.g., 152 Cong. Rec. S10357 (daily ed. Sept. 28, 2006) (statement of Sen. Leahy) (“The habeas stripping provisions in the bill go far beyond what Congress did in the Detainee Treatment Act .... This new bill strips habeas jurisdiction retroactively, even for pending cases.”); id, at S10367 (statement of Sen. Graham) ("The only reason we are here is because of the Hamdan decision. The Hamdan decision did not apply ... the [DTA] retroactively, so we have about 200 and some habeas cases left unattended and we are going to attend to them now.”); id. at SI0403 (statement of Sen. Cornyn) ("[Ojnce ... section 7 is effective, Congress will finally accomplish what it sought to do through the [DTA] last year. It will finally get the lawyers out of Guantanamo Bay. It will substitute the blizzard of litigation instigated by Rasul v. Bush with a narrow DC Circuit-only review of the [CSRT] hearings.”); id. at S10404 (statement of Sen. Sessions) ("It certainly was not my intent, when I voted for the DTA, to exempt all of the pending Guantanamo lawsuits from the provisions of that act. * * * Section 7 of the [MCA] fixes this feature of the DTA and ensures that there is no possibility of confusion in the future.... I don't see how there could be any confusion as to the effect of this act on the pending Guantanamo litigation. The MCA’s jurisdictional bar applies to that litigation ‘without exception.' ”); 152 Cong. Rec. H7938 (daily ed. Sept. 29, 2006) (statement of Rep. Hunter) ("The practical effect of [section 7] will be to eliminate the hundreds of detainee lawsuits that are pending in courts throughout the country and to consolidate all detainee treatment cases in the D.C. Circuit.”); id. at H7942 (Rep.Jackson-Lee) ("The habeas provisions in the legislation are contrary to congressional intent in the [DTA], In that act, Congress did not intend to *987 strip the courts of jurisdiction over the pending habeas [cases].").

. Congress has rarely found it necessary to emphasize the absence of exceptions to a clear rule. Indeed, the use of "without exception” to emphasize the word "all” occurs in only one other provision of the U.S.Code. See 48 U.S.C. § 526(a).

. If section 7(b) did not include habeas cases among cases "which relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention,” it would be inconsistent with section 7(a). Section 7(a) of the MCA first repeals jurisdiction "to hear or consider an application for a writ of habeas corpus” by detainees. 28 U.S.C. § 2241(e)(1). It then repeals jurisdiction over "any other action ... relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement” of a detainee, id. § 2241(e)(2) (emphasis added), thus signifying that Congress considered habeas cases as cases relating to detention, as indeed they are.

. The detainees suggest that federal courts retain some form of residual common law jurisdiction over habeas petitions. Ex parte Bollman, 8 U.S. (4 Cranch) 75, 95, 2 L.Ed. 554 (1807), holds the opposite. See Exporte McCardle, 74 U.S. (7 Wall.) 506, 19 L.Ed. 264 (1868). "Jurisdiction of the lower federal courts is ... limited to those subjects encompassed within a statutory grant of jurisdiction.” Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guiñee, 456 U.S. 694, 701, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982). The observations about common law habeas in Rasul, 542 U.S. at 481-82, 124 S.Ct. 2686, referred to the practice in England. Even if there were such a thing as common law jurisdiction in the federal courts, § 2241(e)(1) quite clearly eliminates all "jurisdiction to hear or consider an application for a writ of habeas corpus" by a detainee, whatever the source of that jurisdiction.
In order to avoid "serious ‘due process,’ Suspension Clause, and Article III problems,” the detainees also urge us not to read section 7 of the MCA to eliminate habeas jurisdiction over Geneva Convention claims. But that reading is unavoidable. Section 7 is unambiguous, as is section 5(a), which states that "No person may invoke the Geneva Conventions or any protocols thereto in any habeas corpus or other civil action or proceeding ... as a source of rights in any court of the United States.”

. During this period, state courts often employed the writ of habeas corpus to inquire into the legality of federal detention. The Supreme Court later held in Ableman v. Booth, 62 U.S. (21 How.) 506, 16 L.Ed. 169 (1859), and Tarble's Case, 80 U.S. (13 Wall.) 397, 20 L.Ed. 597 (1871), that state courts had no such power.

. The dissent claims that the difference between Schiever and the detainees is "exceedingly narrow,” Dissent at 1001-02, because Schiever was brought involuntarily to Liverpool. For this proposition, the dissent cites United States v. Verdugo-Urquidez, 494 U.S. 259, 271, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990). Verdugo-Urquidez was a Fourth Amendment case. Obviously, it had nothing to say about habeas corpus in Eighteenth Century England.

. The detainees are correct that they are not "enemy aliens.” That term refers to citizens of a country with which the United States is at war. See Al Odah, 321 F.3d at 1139-40. But under the common law, the dispositive fact was not a petitioner’s enemy alien status, but his lack of presence within any sovereign territory.

. The dissent claims the lack of any case on point is a result of the unique combination of circumstances in this case. But extraterritorial detention was not unknown in Eighteenth *991 Century England. See Holdsworth, supra, at 116-17; Duker, supra, at 51-53. As noted, supra, these prisoners were beyond the protection of the law, which included access to habeas corpus. And Eisentrager (and the two hundred other alien petitioners the court noted, see 339 U.S. at 768 n. 1, 70 S.Ct. 936) involved both extraterritorial detention and alien petitioners.

. The Rasul decision, resting as it did on statutory interpretation, see 542 U.S. at 475, 483-84, 124 S.Ct. 2686, could not possibly have affected the constitutional holding of Ei-sentrager. Even if Rasul somehow calls Ei-sentrager’s constitutional holding into question, as the detainees suppose, we would be bound to follow Eisentrager. See Rodriguez de Quijos v. Shearson/American Exp., Inc., 490 U.S. 477, 484-85, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989).

. The text of the Suspension Clause also does not lend itself freely to extraterritorial application. The Clause permits suspension of the writ only in cases of "Rebellion or Invasion," neither of which is applicable to foreign military conflicts. See Hamdi v. Rumsfeld, 542 U.S. 507, 593-94, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (Thomas, J., dissenting); see also J. Andrew Kent, A Textual and Historical Case Against a Global Constitution, 95 Geo. L.J. 463, 522 (2007).

. James Madison's plan was to insert almost the entire Bill of Rights into the Constitution rather than wait for amendment. His proposed location of the Bill of Rights? Article I, Section 9 — next to the Suspension Clause. See Thomas Y. Davies, Recovering the Original Fourth Amendment, 98 Mich. L. Rev. 547, 700-01 &n.437 (1999).

. See South Carolina v. Katzenbach, 383 U.S. 301, 323-24, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966) ("[C]ourts have consistently regarded the Bill of Attainder Clause of Article I and the principle of the separation of powers only as protections for individual persons and private groups (citing United States v. Brown, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965); Ex parte Garland, 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1866)); see also Wilkinson v. Dotson, 544 U.S. 74, 82, 125 S.Ct. 1242, 161 L.Ed.2d 253 (2005); Weaver v. Graham, 450 U.S. 24, 28-29, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981); Nixon v. Adm’r of Gen. Servs., 433 U.S. 425, 468-69, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977); Shabazz v. Gabry, 123 F.3d 909, 912 (6th Cir.1997).

. Accord Jay S. Bybee, Common Ground: Robert Jackson, Antonin Scalia, and a Power Theory of the First Amendment, 75 Tul. L. Rev. 251, 318, 321 (2000) ("[W]e could easily describe [Article I,] Section 9 as a bill of rights for the people of the United States.'').

. See Supplemental Br. of the Federal Parties Addressing the Detainee Treatment Act of 2005 53-54 (“This Court can and should convert the pending appeals into petitions for review under [DTA section] 1005(e)(2).”).

. See The Guantanamo Detainees’ Supplemental Br. Addressing the Effect of the Supreme Ct.'s Op. in Hamdan v. Rumsfeld, 126 S.Ct. 2749 (2006), on the Pending Appeals 8-9 (“The detainees in the pending petitions challenge the lawfulness of their detentions— not the subsequent CSRT decisions .... ”); Corrected Supplemental Br. of Pet'rs Boume-diene, et al., & Khalid Regarding Section 1005 of the Detainee Treatment Act of 2005 56-59 (“Nothing in the [DTA] authorizes the Court to 'convert' Petitioners’ notices of appeal of the district court's judgment into original petitions for review of CSRT decisions under section 1005(e)(2) of the Act.”); The Guantanamo Detainees' Corrected Second Supplemental Br. Addressing the Effect of the Detainee Treatment Act of 2005 on this Ct.'s Jurisdiction over the Pending Appeals 43-44 ("[T]his court should not convert these petitions into petitions for review under the DTA as the government suggests.”).