Opinion for the Court filed by Circuit Judge HENDERSON.
Dissenting opinion filed by Senior Circuit Judge EDWARDS.
KAREN LECRAFT HENDERSON, Circuit Judge:
Four Afghan and five Iraqi citizens captured and subsequently held in Afghanistan and Iraq, respectively, by the United States military sued Donald Rumsfeld, former Secretary of the United States Department of Defense, and three high-ranking Army officers[1] (collectively, defen *765 dants) under the Fifth and Eighth Amendments to the United States Constitution, the Alien Tort Statute (ATS), 28 U.S.C. § 1350, and the Third and Fourth Geneva Conventions, 6 U.S.T. 3316 and 6 U.S.T. 3516, seeking damages and declaratory relief as the result of their treatment while in U.S. custody. The district court granted the defendants’ motion to dismiss all six claims and the plaintiffs appeal the dismissal of their constitutional and ATS claims only. For the reasons set forth below, we affirm the district court’s judgment.
I.
The amended complaint alleges the following facts. Arkan Mohammed Ali is an Iraqi citizen who was held at Abu Ghraib and other military facilities in Iraq for almost one year, from approximately July 2003 to June 2004. Am. Compl. ¶ 17. He alleges he was beaten to the point of unconsciousness; stabbed and mutilated; stripped naked, hooded and confined in a wooden phone booth-sized box; subjected to prolonged sleep deprivation enforced by beatings; deprived of adequate food and water and subjected to mock execution and death threats. Id. Thahe Mohammed Sabar is an Iraqi citizen who was held at Abu Ghraib and other military facilities in Iraq for about six months from approximately July 2003 to January 2004. Id. ¶ 18. He alleges he was severely beaten, sexually assaulted and humiliated, deprived of adequate food and water, intentionally exposed to dangerously high temperatures for prolonged periods and subjected to mock executions and death threats. Id. Sherzad Kamal Khalid is an Iraqi citizen who was held at Abu Ghraib and other military facilities in Iraq for about two months from approximately July 2003 through September 2003. Id. ¶ 19. He alleges he was frequently and severely beaten,, sexually assaulted and threatened with anal rape, deprived of adequate food and water, intentionally exposed to dangerously high temperatures and subjected to “mock executions, death threats ... and prolonged sleep deprivation enforced by beatings.” Id. Ali H. is an Iraqi citizen who was held at Abu Ghraib and other military facilities in Iraq for about four weeks from August to September 2003. Id. ¶ 20. He alleges the U.S. military intentionally withheld and delayed necessary medical treatment, intentionally inflicted “pain after surgery by dragging him from one location to another and forcefully ripping away the surgical dressing,” intentionally exposed him to infection by leaving his surgical wound half-bandaged and deprived him of adequate food and water. Id. Najeeb Abbas Ahmed is an Iraqi citizen who was held at Abu Ghraib and other military facilities in Iraq for two separate periods, the first from approximately May 2003 to July 2003 and the second from approximately July 2003 through December 2003. Id. ¶ 21. He alleges U.S. soldiers held a gun to his head, threatened him with death and with life imprisonment at Guantanamo Bay, sexually assaulted him, stepped and sat on his body while he was in extreme restraints, humiliated him by chanting racial epithets while videotaping and photographing him, held him in an outdoor cage at temperatures exceeding approximately 120 degrees Fahrenheit, intentionally deprived him of sleep for prolonged periods, confiscated medication for his high blood pressure and heart disease and intentionally deprived him of medical care after he “suffered more than one heart attack and a possible stroke in detention.” Id. Mehboob Ahmad is a citizen of Afghanistan who was held by the U.S. military at the detention facility located at Bagram Air Force Base (Bagram) and at other military *766 facilities in Afghanistan for approximately five months from June to November 2003. Id. ¶ 22. He alleges U.S. soldiers placed him in restraints and positions calculated to cause pain, intimidated him with a vicious dog, questioned him while he was naked, threatened his family and subjected him to sensory deprivation. Id. Said Nabi Siddiqi is a citizen of Afghanistan who was also held at military facilities in Afghanistan, including Bagram and the Kandahar detention facility, from July to August 2003. Id. ¶ 23. He alleges he was beaten, placed in restraints and positions calculated to cause pain, subjected to “verbal abuse of a sexual nature,” humiliated by being photographed naked, denied water, intentionally deprived of necessary medication, intentionally exposed to dangerous temperatures for prolonged periods and deprived of sleep. Id. Mohammed Karim Shirullah is a citizen of Afghanistan who was held at Bagram and other military facilities in Afghanistan for approximately six months, from December 2003 to June 2004. Id. ¶ 24. He alleges he was beaten, placed in restraints and positions calculated to cause pain, interrogated and photographed while naked, subjected to sensory deprivation and placed in solitary confinement for an extended period, denied medical care for injuries caused by abuse, intentionally exposed to extreme temperatures for prolonged periods, doused with cold water and deprived of sleep. Id. Haji Abdul Rahman is a citizen of Afghanistan who was held at Ba-gram and other military facilities in Afghanistan for approximately five months, from December 2003 to May 2004. Id. ¶25. He alleges he was questioned and photographed while naked, subjected to complete sensory deprivation for twenty-four hours, placed in solitary confinement and deprived of sleep. Id.
The plaintiffs originally filed separate actions in four different jurisdictions — the District of Connecticut, the Northern District of Illinois, the District of South Carolina and the Southern District of Texas. By an order dated June 17, 2005, the Judicial Panel on Multidistrict Litigation transferred the cases to the district court of the District of Columbia for coordinated and consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. The plaintiffs filed an amended complaint on January 5, 2006. They allege the defendants:
(1) formulated or implemented policies and practices that caused the torture and other cruel, inhuman or degrading treatment of Plaintiffs; and (2) had effective command and control of U.S. military personnel in Iraq and/or Afghanistan and knew and had reason to know of torture and abuse by their subordinates and failed to promptly and effectively prohibit, prevent and punish unlawful conduct.
Id. ¶ 26. The plaintiffs asserted six causes of action in the district court; five asserted claims for violations of (1) the Due Process Clause of the Fifth Amendment, (2) the Fifth Amendment and Eighth Amendment prohibitions against cruel and unusual punishment, (3) the law of nations prohibition against torture, (4) the law of nations prohibition against cruel, inhuman or degrading treatment and (5) the Geneva Conventions. Am. Compl. ¶¶ 235-59. The sixth cause of action sought a declaratory judgment that defendant Rumsfeld violated “the law of nations, binding treaties and the U.S. Constitution.” Id. ¶¶ 260-63. In March 2006, the defendants moved to dismiss the amended complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure (FRCP) for lack of subject matter jurisdiction and failure to state claims upon which relief may be *767 granted.[2]
On March 27, 2007, the district court dismissed the plaintiffs’ amended complaint pursuant to FRCP 12(b)(1) and 12(b)(6) “and on the ground that the defendants are entitled to qualified immunity.” In re Iraq & Afghanistan Detainees Litig. (Detainees Litig.), 479 F.Supp.2d 85, 119 (D.D.C.2007). Regarding the constitutional claims brought pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971),[3] the district court held the Fifth and Eighth Amendments do not apply to “nonresident aliens who were injured extraterritorially while detained by the military in foreign countries where the United States is engaged in wars.”[4] Detainees Litig., 479 F.Supp.2d at 95. The court relied on the United States Supreme Court’s holdings in Johnson v. Eisentrager, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950), and United States v. Verdugo-Urquidez, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), and Zadvydas v. Davis, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), and on our holding in Boumediene v. Bush, 476 F.3d 981 (D.C.Cir.2007), rev’d, 553 U.S. 723, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008).[5] The court further held that *768 even if the plaintiffs could claim constitutional protections, special factors would counsel against inferring a Bivens remedy. Detainees Litig., 479 F.Supp.2d at 103-07. It explained “that military affairs, foreign relations, and national security are constitutionally committed to” the President and the Congress and concluded “that authorizing monetary damages remedies against military officials engaged in an active war would ... obstruct the Armed Forces’ ability to act decisively and without hesitation in defense of our liberty and national interests.” Id. at 107, 105. Finally, the district court held that qualified immunity protected the defendants from the Bivens claims because, even if the plaintiffs possess constitutional rights, “those rights were not clearly established at the time the alleged injurious conduct occurred.” Id. at 108.
As to the Geneva Conventions claims and the' alleged violations of the law of nations brought pursuant to the ATS,[6] the district court held that “the defendants are entitled to absolute immunity pursuant to the Westfall Act,” according to which Act the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346, 2671 et seq., provides the exclusive remedy for a tort committed by a federal official or employee within the scope of his employment.[7] 479 F.Supp.2d at 114. The court concluded the Westfall Act includes an intentional tort, id. at 110— 11, and, relying on the Restatement (See *769 ond) of Agency § 228 (1958),[8] determined the defendants acted within the scope of their employment because “detaining and interrogating enemy aliens” was “incidental to their overall military obligations.” Id. at 114. The court further ruled that neither the ATS claims nor the Geneva Conventions claims fell within one of the statutory exceptions to the Westfall Act. Id. at 111-13. Accordingly, the court substituted the United States as the defendant on the ATS and Geneva Conventions claims and then dismissed those claims because the plaintiffs failed to exhaust their administrative remedies as required by the FTCA. Id. at 114-15.
The district court rejected the plaintiffs’ allegation that Geneva Convention IV itself provides a private cause of action and dismissed their claims for violations of the Convention for failure to state a claim for relief. Id. at 115-17. Regarding their claim for declaratory relief, the court held the plaintiffs lacked standing because the named defendants no longer held their official positions in Iraq or Afghanistan and therefore the plaintiffs could not show “that they face a real and imminent threat of being wronged again in the future” by those defendants. Id. at 118. Additionally, the court held the plaintiffs, having sued the defendants in their individual capacities only, could not seek declaratory relief.[9] Id. at 118-19.
The plaintiffs timely filed a notice of appeal on May 24, 2007, challenging the district court’s dismissal of their constitutional and ATS claims and its dismissal of their claim for declaratory relief. They do not appeal the dismissal of their Geneva Conventions claims.
II.
In reviewing the district court’s grant of a motion to dismiss, we accept as true the factual allegations of the plaintiffs’ complaint and review the district court’s legal conclusions de novo. Daniels v. Union Pac. R.R. Co., 530 F.3d 936, 940 (D.C.Cir. 2008) (“We review the district court’s legal conclusions de novo ... [and] accept as true the facts that [the plaintiffs] allege[ ] in [their] complaint in reviewing the district court’s disposition of the defendants’ motion to dismiss.” (alterations in original) (internal quotation marks omitted)). We address seriatim the plaintiffs’ constitutional claims, their ATS claims and their claim for declaratory relief.
A. The Bivens Claims
Each plaintiff asserts two Bivens claims, namely, the defendants tortured him in violation of his due process right under the Fifth Amendment and the defendants’ conduct constituted cruel and unusual punishment in violation of the Eighth Amendment.[10] Am. Compl. ¶¶ 235-46. *770 Our decisions in Rasul v. Myers (Rasul I), 512 F.3d 644 (D.C.Cir.), vacated, — U.S. -, 129 S.Ct. 763, 172 L.Ed.2d 753 (2008), and Rasul v. Myers (Rasul II), 563 F.3d 527 (D.C.Cir.) (per curiam), cert. denied, — U.S. -, 130 S.Ct. 1013, 175 L.Ed.2d 618 (2009), govern our resolution of these claims.
In Rasul I, four British citizens sued Secretary Rumsfeld and several high-ranking military officials for damages arising from their alleged illegal detention and torture at Guantanamo Bay, Cuba between 2002 and 2004. Rasul I, 512 F.3d at 649-50. Their complaint included claims under the Fifth and Eighth Amendments, the ATS, the Geneva Conventions and the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb et seq. We affirmed the district court’s dismissal of the constitutional claims, explaining that “Guantanamo detainees lack constitutional rights because they are aliens without property or presence in the United States.” 512 F.3d at 663 (citing Boumediene v. Bush, 476 F.3d 981, 984 (D.C.Cir.2007), rev’d, 553 U.S. 723, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008)). Furthermore, we concluded the defendants were protected by qualified immunity because, even assuming arguendo the detainees possessed rights under the Fifth and Eighth Amendments, those rights were not clearly established at the
time of their detention and alleged torture. Id. at 665-67. After Rasul I issued, the Supreme Court reversed our Boumediene decision and held the Suspension Clause extends to nonresident aliens detained at Guantanamo Bay. Boumediene v. Bush, 553 U.S. 723, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008). The Court then vacated our judgment in Rasul I and remanded for further consideration in light of its intervening decision in Boumediene. Rasul v. Myers, — U.S. -, 129 S.Ct. 763, 172 L.Ed.2d 753 (2008).
On remand, we reaffirmed our holding that the defendants were protected by qualified immunity and explained it was not necessary to determine whether the Fifth and Eighth Amendments applied to the plaintiffs.[11] Qualified immunity shields a government official from civil liability if his conduct “does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Even if the Rasul plaintiffs could assert rights under the Fifth and Eighth Amendments, we explained, Boumediene did not alter the conclusion that those rights were not clearly established at the time of the defendants’ challenged conduct. *771 Rasul II, 563 F.3d at 529-30. The plaintiffs argue, as did the Rasul plaintiffs, that the defendants should have known (that is, a reasonable person would have known) their alleged misconduct violated the Constitution because it “has long been settled that the Constitution forbids the torture of any detainee.”[12] Appellants’ Br. 23; see Rasul I, 512 F.3d at 666. The proper inquiry, however, is not whether the Constitution prohibits torture but “whether the rights the plaintiffs press under the Fifth and Eighth Amendments were clearly established at the time of the alleged violations.” Rastil I, 512 F.3d at 666 (emphasis in original). As the Supreme Court made clear in Boumediene, it had “never held that noncitizens detained by our Government in territory over which another country maintains de jure sovereignty have any rights under our Constitution.” 553 U.S. at 770, 128 S.Ct. 2229; see also Rasul II, 563 F.3d at 530 (“At the time of [the plaintiffs’] detention, neither the Supreme Court nor this court had ever held that aliens captured on foreign soil and detained beyond sovereign U.S. territory had any constitutional rights — under the Fifth Amendment, the Eighth Amendment, or otherwise.”). As it was not clearly established in 2004 that the Fifth and Eighth Amendments apply to aliens detained at Guantanamo Bay — where the Supreme Court has since held the Suspension Clause applies — it plainly was not clearly established in 2004 that the Fifth and Eighth Amendments apply to aliens held in Iraq and Afghanistan — where no court has held any constitutional right applies. As we explained in Rasul II, the Supreme Court in Boumediene “explicitly confined its constitutional holding ‘only’ to the extraterritorial reach of the Suspension Clause” and “disclaimed any intention to disturb existing law governing the extraterritorial reach of any constitutional provisions, other than the Suspension Clause.” 563 F.3d at 529 (quoting Boumediene, 553 U.S. at 795, 128 S.Ct. 2229). As in Rasul II, therefore, the defendants here are protected from the plaintiffs’ constitutional claims by qualified immunity.[13]
The plaintiffs contend the Supreme Court in Boumediene adopted a flexible approach that leaves open the possibility of the extraterritorial application of constitutional provisions other than the Suspension Clause and claim that our decision in Al Maqaleh v. Gates, 605 F.3d 84 (D.C.Cir. 2010), accurately interprets Boumediene. Because the three alien Bagram detainees in Al Maqaleh sought habeas corpus relief, the decision addresses only the applicability of the Suspension Clause. We nonetheless noted that the Supreme Court’s Boumediene decision “explored the more general question of extension of constitutional rights and the concomitant constitutional restrictions on governmental power exercised extraterritorially and with respect to noncitizens.” Id. at 93. The court discussed three factors the Supreme Court identified as relevant in determining the reach of the Suspension Clause: “(1) the citizenship and status of the detainee *772 and the adequacy of the process through which that status determination was made; (2) the nature of the sites where apprehension and then detention took place; and (8) the practical obstacles inherent in resolving the prisoner’s entitlement to the writ.” Id. at 94 (quoting Boumediene, 553 U.S. at 766, 128 S.Ct. 2229). The first factor weighed in favor of extending the habeas corpus right to the three because, like the Boumediene detainees, they were aliens held by the American military. Id. at 95-96. According to the court, the three received less due process than the Boumediene detainees.[14] Id. The second and third factors, however, weighed against them. Distinguishing Guantanamo Bay— where, according to the Supreme Court, the United States has defacto sovereignty, Boumediene, 553 U.S. at 755, 128 S.Ct. 2229 — the court concluded “the same simply is not true with respect to Bagram.” Al Maqaleh, 605 F.3d at 97. The United States has not demonstrated an intent to exercise sovereignty over Bagram “with permanence.” Id. Moreover, “Bagram, indeed the entire nation of Afghanistan, remains a theater of war.” Id. The same is true of Iraq. The Supreme Court expressly stated in Boumediene that, if Guantanamo Bay “were located in an ac-five theater of war, arguments that issuing the writ would be ‘impractical or anomalous’ would have more weight.” 553 U.S. at 770, 128 S.Ct. 2229. We concluded “that under both Eisentrager and Boumediene, the [habeas corpus] writ does not extend to the Bagram confinement in an active theater of war in a territory under neither the de facto nor de jure sovereignty of the United States and within the territory of another de jure sovereign.” Al Maqaleh, 605 F.3d at 98. Thus, even under the plaintiffs’ view of Boumediene, we have nonetheless held that the Suspension Clause does not apply to Bagram detainees. They offer no reason — and we see none ourselves — why the plaintiffs’ Fifth and Eighth Amendment claims would be any stronger than the Suspension Clause claims of the Bagram detainees.
 The plaintiffs urge us to follow the now-optional Saucier procedure and decide, first, whether they have “alleged a deprivation of a constitutional right at all,” Pearson, 129 S.Ct. at 816 (internal quotation marks omitted), although we may ultimately conclude any such right was not clearly established at the time of the defendants’ alleged misconduct.[15] The Sau *773 cier procedure, however, is not appropriate in most cases. Often “it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right.” ' Id. In such a case, deciding the existence of the constitutional right vel non is “an essentially academic exercise,” id, that “runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality ... unless such adjudication is unavoidable,” id. at 821 (ellipsis in original) (internal quotation marks and citations omitted), and results in the “substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case,” id. at 818. The Saucier approach can also preclude an affected party from obtaining appellate review of a decision that could significantly affect its future actions. Id. at 820. If a court decides that the defendant violated the plaintiffs constitutional right but is entitled to qualified immunity because the right was not clearly established at the time, the “prevailing” defendant presumably would not be able to appeal the adverse constitutional holding. Id. (citing Kalka v. Hawk, 215 F.3d 90, 96 n. 9 (D.C.Cir.2000) (“Normally, a party may not appeal from a favorable judgment.”)); cf. Camreta v. Greene, — U.S. -, 131 S.Ct. 2020, 2028-33, 179 L.Ed.2d 1118 (2011) (official who prevails on qualified immunity in district court may not be able to obtain appellate review, notwithstanding availability of certiorari review to official who prevails on qualified immunity on appeal). As in Rasul II, we believe “[cjonsiderations of judicial restraint favor exercising the Pearson option with regard to [the] plaintiffs’ Bivens claims.” 563 F.3d at 530.
In Rasul II we had an alternative basis — apart from qualified immunity — on which to dismiss the plaintiffs’ Bivens claims- — -that “federal courts cannot fashion a Bivens action when ‘special factors’ counsel against doing so.” 563 F.3d at 532 n. 5. We determined the “danger of obstructing U.S. national security policy is one such factor” that counsels against allowing a Bivens claim to proceed.[16] Id. The same rationale applies here.[17] The district court correctly concluded that allowing a Bivens action to be brought against American military officials engaged in war would disrupt and hinder the ability of our armed forces “to act decisively and without hesitation in defense of our liberty and national interests.” Detainees Litig., 479 F.Supp.2d at 105. The Supreme Court long ago recognized as much in Eisentrager:
Such trials would hamper the war effort and bring aid and comfort to the enemy. They would diminish the prestige of our commanders, not only with enemies but with wavering neutrals. It would be difficult to devise more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home. Nor is it unlikely that the result of such enemy litigiousness would be a conflict between judicial and military opinion highly comforting to enemies of the United States.
339 U.S. 763, 779, 70 S.Ct. 936, 94 L.Ed. 1255 (1950). And in Sanchez-Espinoza v. *774 Reagan, 770 F.2d 202, 209 (D.C.Cir.1985), our court noted that “the special needs of foreign affairs must stay our hand in the creation of damage remedies against military and foreign policy officials for allegedly unconstitutional treatment of foreign subjects causing injury abroad.” In Sanchez-Espinoza, Nicaraguan citizens, none of whom resided in the United States, sued, inter alia, the President, the CIA director, the then-current as well as former secretaries of state and the then-secretary of defense alleging they had “authorized, financed, trained, directed and knowingly provided substantial assistance” to Nicaraguan rebels who engaged in “summary execution, murder, abduction, torture, rape, wounding, and the destruction of private property and public facilities.” Id. at 205 (quoting Am. Compl. ¶¶ 31, 81). We concluded that “the danger of foreign citizens’ using the courts in [such situation] to obstruct the foreign policy of our government is sufficiently acute that we must leave to Congress the judgment whether a damage remedy should exist.” Id. at 209. As in Rasul II, we see no basis for distinguishing this case from Sanchez-Espinoza. Accordingly, even if the defendants were not shielded by qualified immunity and the plaintiffs could claim the protections of the Fifth and Eighth Amendments, we would decline to sanction a Bivens cause of action because special factors counsel against doing so.
B. The ATS Claims
Rasul II also governs our resolution of the plaintiffs’ ATS claims alleging violations of the law of nations. In addition to their Bivens claims, the Rasul plaintiffs “brought three claims for violations of the law of nations pursuant to the [ATS] based on the defendants’ alleged infliction of ‘prolonged arbitrary detention,’ ‘torture,’ and ‘cruel, inhuman or degrading treatment.’ ”[18] Rasul I, 512 F.3d at 654 (citations omitted). We determined the defendants’ alleged tortious conduct— “the detention and interrogation of suspected enemy combatants” — was “incidental to [their] legitimate employment duties” because it was “the type of conduct the defendants were employed to engage in.” Id. at 658-59. Because the defendants had acted within the scope of their employment, we held the ATS claims “were properly restyled as claims against the United States that are governed by the FTCA” and upheld their dismissal for failure to exhaust administrative remedies.[19] Id. at 660-61 (internal quotation marks and brackets omitted). The plaintiffs here bring similar claims against similar (and, in the case of defendant Rumsfeld, identical) defendants. And like the Rasul defendants who, we held, were acting within the scope of their employment, the defendants here — who engaged in the same conduct — were acting within the scope of their employment as well. See id. at 654-61. The plaintiffs argue the Westfall Act does not cover “egregious torts that violate jus cogens norms” because the Act grants immunity for a “ ‘negligent or wrongful act or omission’ ” only. Appellants’ Br. 46 (quot *775 ing 28 U.S.C. § 2679(b)(1)). The plaintiffs argue “wrongful” is ambiguous and should be interpreted in light of the Act’s legislative history which, the plaintiffs contend, reveals “wrongful” was not intended to encompass egregious torts that violate jus cogens norms. We explicitly rejected this argument in Rasul I, where, while acknowledging the plaintiffs had “plainly alleged ‘seriously criminal’ conduct,” we explained that “the allegations of serious criminality do not alter our conclusion that the defendants’ conduct was incidental to authorized conduct.” 512 F.3d at 659-60. Accordingly, the district court correctly held that the Westfall Act applied and correctly substituted the United States as the defendant under the FTCA.[20] The FTCA “required the plaintiffs to file an administrative claim with either the Department of Defense (DoD) or the appropriate military department before bringing suit.” Id. at 661 (citing 28 C.F.R. § 14.1). “[W]e view the failure to exhaust administrative remedies as jurisdictional.” Id. As in Rasul, the “record is devoid ... of any suggestion” the plaintiffs filed an administrative claim with DoD or a military department. Id. The district court thus properly dismissed the ATS claims under FRCP 12(b)(1) for lack of subject matter jurisdiction.
The plaintiffs raise one argument not addressed in Rasul I or II. The West-fall Act does not immunize a federal employee/official from a suit “brought for a violation of a statute of the United States under which such action against an individual is otherwise authorized.” 28 U.S.C. § 2679(b)(2)(B). The plaintiffs claim the ATS, under which they brought their claims for violations of the law of nations, is a United States statute that permits a private cause of action against a federal employee/official. Therefore, the plaintiffs contend, their claims fall within an exception to the Westfall Act and they should be permitted to proceed against the individual defendants, not the United States.
The district court in Rasul I rejected this argument, explaining that the ATS[21] “is strictly a jurisdictional statute” that “does not confer rights nor does it impose obligations or duties that, if violated, would trigger the Westfall Act’s statutory exception.” [22] 414 F.Supp.2d 26, 37-38 (D.D.C. 2006). The Supreme Court has also rejected a similar argument. In United States v. Smith, 499 U.S. 160, 111 S.Ct. 1180, 113 L.Ed.2d 134 (1991), a former Army sergeant and his wife sued the Army doctor who delivered their baby in Italy, alleging the doctor’s negligence caused *776 brain damage to the baby. The United States sought to substitute itself as the defendant pursuant to the Gonzalez Act, 10 U.S.C. § 1089, which “provide[d] that in suits against military medical personnel for torts committed within the scope of their employment, the Government is to be substituted as the defendant and the suit is to proceed against the Government under the FTCA.” Smith, 499 U.S. at 162-63, 111 S.Ct. 1180. While the plaintiffs’ appeal was pending, the Congress enacted the Westfall Act. The United States then relied on the Westfall Act, rather than the Gonzalez Act, to substitute itself as the defendant and the Supreme Court accordingly considered the Westfall Act’s applicability. At the time, two courts of appeals had held that the Gonzalez Act protected “only military medical personnel who commit torts within the United States and not those committing torts abroad.” Id. at 171, 111 S.Ct. 1180. The Smith plaintiffs argued their claim was therefore not precluded by the Gonzalez Act and that their claim fell within the statutory exception to the Westfall Act because the Gonzalez Act “authorized” their claim. The Supreme Court rejected the plaintiffs’ argument. It explained that it “need not decide whether a tort claim brought under state or foreign law could be deemed authorized by the Gonzalez Act” because the plaintiffs’ contention “that a claim for malpractice involves ‘a violation of the Gonzalez Aet[ ]is without merit. Nothing in the Gonzalez Act imposes any obligations or duties of care upon military physicians. Consequently, a physician allegedly committing malpractice under state or foreign law does not ‘violate’ the Gonzalez Act.” Id. at 174, 111 S.Ct. 1180.
More importantly, the Supreme Court has clarified that “the ATS is a jurisdictional statute creating no new causes of action.” Sosa v. Alvarez-Machain, 542 U.S. 692, 724, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004); id. at 729, 124 S.Ct. 2739 (“All Members of the Court agree that § 1350 is only jurisdictional.”). Thus, as with the Gonzalez Act, nothing in the ATS “imposes any obligations or duties of care upon” the defendants. Smith, 499 U.S. at 174, 111 S.Ct. 1180; accord Bancoult v. McNamara, 370 F.Supp.2d 1, 9 (D.D.C.2004) (“The plain language of [the ATS] ... does not confer rights nor does it impose obligations or duties that, if violated, would trigger the [Westfall Act’s statutory violation] exception.”), ajfd on other grounds, 445 F.3d 427 (D.C.Cir.2006) (dismissing complaint on political question ground), cert. denied, 549 U.S. 1166, 127 S.Ct. 1125, 166 L.Ed.2d 892 (2007); Schneider v. Kissinger, 310 F.Supp.2d 251, 266-67 (D.D.C. 2004) (dismissing complaint on political question ground but holding, alternatively, that ATS “cannot be violated for purposes of [Westfall Act’s statutory violation exception]”), aff'd on other grounds, 412 F.3d 190 (D.C.Cir.2005) (affirming dismissal as political question), cert. denied, 547 U.S. 1069, 126 S.Ct. 1768, 164 L.Ed.2d 515 (2006). The plaintiffs ask us to ignore the Supreme Court’s Sosa decision.[23] We can no more ignore Supreme Court precedent than could the district court. Accordingly, we hold that the plaintiffs’ claim under the ATS alleges a violation of the law of nations, not of the ATS, and therefore does not violate a statute of the United States within the meaning of section 2679(b)(2)(B).[24]
*777 Notwithstanding Sosa’s plain statement that “the ATS is a jurisdictional statute,” 542 U.S. at 724,124 S.Ct. 2739, the dissent believes the ATS incorporates the law of nations and that a violation of the law of nations thus constitutes a violation of the ATS sufficient to satisfy the Westfall Act’s statutory violation exception. See Dissenting Op. at 789-93. The respondent in Sosa advanced a similar argument — “that the ATS was intended not simply as a jurisdictional grant, but as authority for the creation of a new cause of action for torts in violation of international law.” 542 U.S. at 713, 124 S.Ct. 2739. The- Supreme Court rejected “that reading [of the ATS as] implausible,” explaining that, “[a]s enacted in 1789, the ATS gave the district courts ‘cognizance’ of certain causes of action, and the term bespoke a grant of jurisdiction, not power to mold substantive law.” Id. Moreover, the Court noted, the positioning of the ATS “in § 9 of the Judiciary Act, a statute otherwise exclusively concerned with federal-court jurisdiction, is itself support for its strictly jurisdictional nature.”[25] Id. The Court therefore found it “unsurprising ... that an authority on the historical origins of the ATS has written that ‘section 1350 clearly does not create a statutory cause of action,’ and that the contrary suggestion is ‘simply frivolous.’ ” Id. (quoting William R. Casto, The Federal Courts’ Protective Jurisdiction over Torts Committed in Violation of the Law of Nations, 18 Conn. L. Rev. 467, 479, 480 (1986)); see also Casto, supra, at 479 (“The [ATS] is purely jurisdictional, and the first Congress undoubtedly understood this to be the case.”).
*778 The dissent’s citations to Sosa — and to Filartiga v. Pencu-Irala, 630 F.2d 876 (2d Cir.1980) — confirm that the ATS is a jurisdictional statute only and that any claim brought under the ATS alleges a violation of the law of nations and the common law, not of the ATS itself. See Dissenting Op. at 779-81, 784-85, 788.
The dissent contends that Supreme Court precedent establishing “that the domestic law of the United States recognizes the law of nations,” Sosa, 542 U.S. at 729-30, 124 S.Ct. 2739 (citing cases), “indicates that section 1350 itself effectively incorporates the law of nations,” Dissenting Op. at 789. The Sosa Court’s statement “that the domestic law of the United States recognizes the law of nations,” however, is best understood to refer to the common law of the United States, not its statutory law. The most recent precedent the Court cited to support its statement confirms this understanding. See Sosa, 542 U.S. at 730, 124 S.Ct. 2739 (“ ‘[International disputes implicating ... our relations with foreign nations’ are one of the ‘narrow areas’ in which ‘federal common law’ continues to exist.” (ellipsis in original) (emphasis added) (quoting Tex. Indus., Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 641, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981))); see also Dissenting Op. at 788 (quoting William A. Fletcher, International Human Rights in American Courts, 93 Va. L. Rev. 653, 665 (2007)).
Sosa unequivocally holds that the ATS is a jurisdictional statute only. Sosa, 542 U.S. at 729, 124 S.Ct. 2739 (“All Members of the Court agree that § 1350 is only jurisdictional.”). A claim brought under the ATS therefore does not allege “a violation of a statute of the United States” satisfying the Westfall Act exception. 28 U.S.C. § 2679(b)(2)(B).
C. The Declaratory Judgment Claim
The plaintiffs also seek a declaration that the acts alleged in their amended complaint are unlawful and violate the U.S. Constitution, military rules and guidelines and the law of nations. Am. Compl. ¶ 264(a). As discussed supra, however, the plaintiffs have not alleged a cognizable cause of action and therefore have no basis upon which to seek declaratory relief. Nor does the Declaratory Judgment Act (DJA), 28 U.S.C. § 2201, provide a cause of action. It is a “well-established rule that the Declaratory Judgment- Act ‘is not an independent source of federal jurisdiction.’ Rather, ‘the availability of [declaratory] relief presupposes the existence of a judicially remediable right.’ ” C & E Servs., Inc. of Washington v. D.C. Water & Sewer Auth., 310 F.3d 197, 201 (D.C.Cir.2002) (quoting Schilling v. Rogers, 363 U.S. 666, 677, 80 S.Ct. 1288, 4 L.Ed.2d 1478 (1960)); see also Shelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671, 70 S.Ct. 876, 94 L.Ed. 1194 (1950) (“The operation of the Declaratory Judgment Act is procedural only. Congress enlarged the range of remedies available in the federal courts but did not extend their jurisdiction.” (internal quotation marks and citation omitted)).
For the foregoing reasons, we affirm the district court’s judgment of dismissal.

So ordered.

. Army Lieutenant General Ricardo Sanchez, commander of the “Coalition Joint Task Force-7" from June 2003 to July 2004 and “the highest-ranking U.S. military official in Iraq," Am. Compl. ¶ 28; Janis Karpinski, commander of the “800th Military Police Brigade,” which was responsible for detention facilities in Iraq, from approximately June 2003 to May 2004; and Colonel Thomas Pap-pas, commander of the “205th Military Intelligence Brigade” who in November 2003 assumed command of the “Joint Interrogation and Debriefing Center” at Abu Ghraib prison near Baghdad, Iraq. Id. ¶¶ 29-30.

. Additionally, defendants Karpinski and Sanchez argued the plaintiffs’ claims raise nonjusticiable political questions and defendant Pappas argued the constitutional claims against him should be dismissed because the plaintiffs’ allegations failed to connect him to the alleged constitutional violations and all claims against him should be dismissed for lack of personal jurisdiction. Because it dismissed the plaintiffs’ cases on other grounds, the district court considered these arguments moot.

. “The holding in Bivens permits a plaintiff to bring an action in federal court against a federal officer/employee for the violation of his constitutional rights. 403 U.S. at 389, 91 S.Ct. 1999. A Bivens suit is the federal counterpart of a claim brought pursuant to 42 U.S.C. § 1983 against a state or local officer/employee for the violation of the claimant's constitutional rights.” Rasul v. Myers, 512 F.3d 644, 652 n. 2 (D.C.Cir.), vacated, — U.S. -, 129 S.Ct. 763, 172 L.Ed.2d 753 (2008).

. The district court also held that the plaintiffs' Eighth Amendment claim failed "not only because the plaintiffs are precluded from invoking the Constitution ..., but also because the Eighth Amendment applies only to convicted criminals” and the plaintiffs “were never convicted of a crime.” 479 F.Supp.2d at 103 (citing Ingraham v. Wright, 430 U.S. 651, 664, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977)). On appeal the plaintiffs contend their Eighth Amendment claim is cognizable. Because we affirm the district court’s dismissal of the Eighth Amendment claim on other grounds, we do not reach this argument.

.In Eisentrager, the Supreme Court held that German nationals who were imprisoned at a U.S. army base in Germany and convicted of war crimes committed during World War II had no habeas corpus right under the U.S. Constitution. In Verdugo-Urquidez, the Court held that a Mexican citizen whose residence in Mexico was searched by agents of the United States Drug Enforcement Administration could not assert a claim under the Fourth Amendment to the U.S. Constitution. The Court explained that it had “rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States” and described holdings such as Plyler v. Doe, 457 U.S. 202, 210-12, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (illegal aliens residing in United States protected by Equal Protection Clause), and Kwong Hai Chew v. Colding, 344 U.S. 590, 596, 73 S.Ct. 472, 97 L.Ed. 576 (1953) (resident alien “person” within meaning of Fifth Amendment), and Bridges v. Wixon, 326 U.S. 135, 148, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945) (resident aliens have First Amendment rights), and Russian Volunteer Fleet v. United States, 282 U.S. 481, 489, 51 S.Ct. 229, 75 L.Ed. 473 (1931) (foreign corporation doing business in America entitled to just compensation under Fifth Amendment for property taken by U.S. government), and Wong Wing v. United States, 163 U.S. 228, 238, 16 S.Ct. 977, 41 L.Ed. 140 (1896) (resident aliens entitled to Fifth and Sixth Amendment rights), and Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 30 *768 L.Ed. 220 (1886) (Fourteenth Amendment protects resident aliens), as "establish[ing] only that aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country.” 494 U.S. at 269, 271, 110 S.Ct. 1056. In Zadvydas, the Court reaffirmed the constitutional distinction between persons present in the United States and persons outside the United States. The Court held that a federal statute authorizing the Government to hold an alien who has been ordered deported beyond the 90-day "removal period” within which the alien is to be deported permits the Government to hold the alien for only a “reasonable time.” 533 U.S. at 682, 121 S.Ct. 2491. The Court explained the statute would "raise serious constitutional concerns” if it allowed the Government to hold indefinitely a deportable alien present in the United States, id., but reiterated “that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders,” relying on Eisentrager and Verdugo-Urquidez. 533 U.S. at 693, 121 S.Ct. 2491. In Boumediene, we held that both Supreme Court and our own precedent "hold[] that the Constitution does not confer rights on aliens without property or presence within the United States.” 476 F.3d at 991. The Supreme Court reversed our decision in Boumediene and held, for the first time, that alien detainees held at Guantanamo Bay, Cuba, can assert a habeas corpus right under the Suspension Clause of the U.S. Constitution. 553 U.S. 723, 128 S.Ct. 2229; see U.S. Const, art. I, § 9, cl. 2 (Suspension Clause). As set forth infra p. 769-72, we distinguish the Supreme Court's Boumediene decision.

. The ATS provides: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.” 28 U.S.C. § 1350.

. The Federal Employees Liability Reform and Tort Compensation Act of 1988, Pub. L. No. 100-694, 102 Stat. 4563 (amending 28 U.S.C. §§ 2671, 2674, 2679), commonly referred to as the Westfall Act, provides in pertinent part:
Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.
28 U.S.C. § 2679(d)(1). The Westfall Act makes the FTCA remedy "exclusive of any other civil action or proceeding for money damages.” Id. § 2679(b)(1).

.The Restatement (Second) of Agency § 228 (1958) provides in part:
(1) Conduct of a servant is within the scope of employment if, but only if:
(a) it is of the kind he is employed to perform;
(b) it occurs substantially within the authorized time and space limits;
(c) it is actuated, at least in part, by a purpose to serve the master, and
(d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

. The court apparently overlooked the fact that the plaintiffs sued defendant Rumsfeld in both his individual and official capacities. See Am. Compl. ¶ 27.

. The second claim also alleges the defendants’ conduct constituted cruel and unusual punishment in violation of the Fifth Amendment. It is unclear, however, how this claim differs from the plaintiffs’ first claim that the defendants violated the Fifth Amendment by engaging in torture. Although an individual not yet convicted of a crime must challenge his treatment or the conditions of his confine *770 ment under the Due Process Clause of the Fifth or Fourteenth Amendments rather than the Eighth Amendment, see City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); Iqbal v. Hasty, 490 F.3d 143, 168 (2d Cir.2007), rev’d on other ground sub nom. Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (complaint failed to plead sufficient facts to state claim for relief); Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 259 n. 1 (7th Cir.1996), cert. denied, 519 U.S. 1109, 117 S.Ct. 945, 136 L.Ed.2d 834 (1997), he does not create two separate claims under either Due Process Clause by alleging both torture and cruel and unusual punishment.

. Another intervening Supreme Court decision — Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 815-16, 818, 172 L.Ed.2d 565 (2009) — held that a court can decide a constitutional right was not clearly established without first deciding whether the right exists. Before Pearson, courts followed the Saucier procedure, under which they first had to determine whether the alleged facts made out a violation of a constitutional or statutory right before deciding whether the right was clearly established at the time of the alleged violation. Id. at 815-16; see also Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

. The plaintiffs also cite several "military laws, regulations, and training materials” prohibiting torture which, they contend, “reinforce the constitutional prohibition against torture and serve to put military commanders and personnel on notice of the sorts of actions that the Constitution prohibits.” Appellants’ Br. 24-25.

. Even the plaintiffs recognize this and ask us to "abandon [our] holdings to the contrary." Appellants' Br. 23. "That argument is misplaced because we are, of course, bound to follow circuit precedent absent contrary authority from an en banc court or the Supreme Court.” United States v. Carson, 455 F.3d 336, 384 n. 43 (D.C.Cir.2006) (per curiam), cert. denied, 549 U.S. 1246, 127 S.Ct. 1351, 167 L.Ed.2d 146 (2007).

. The Al Maqaleh detainees' status was reviewed by the Unlawful Enemy Combatant Review Board (UECRB), not the Combatant Status Review Tribunal (CSRT) that reviewed the Boumediene detainees' status. 605 F.3d at 96. According to the court, "proceedings before the UECRB afford[ed] even less protection to the rights of detainees in the determination of status than was the case with the CSRT.” Id. The Al Maqaleh detainees had no representation while the Boumediene detainees had "personal representative[s].” Al Maqaleh v. Gates, 604 F.Supp.2d 205, 227 (D.D.C.2009), rev’d, 605 F.3d 84 (D.C.Cir. 2010). Additionally, the Al Maqaleh detainees were not permitted to speak in their defense but could submit only a written statement and were not Informed of the evidence against them so that they lacked a meaningful opportunity to rebut the evidence. Id.

. We recognize that the Saucier approach is "often beneficial” and helps "promote[] the development of constitutional precedent.” Pearson, 129 S.Ct. at 818; see also Camreta v. Greene, -U.S. -, 131 S.Ct. 2020, 2032, 179 L.Ed.2d 1118 (2011). As the Supreme Court explained, in some cases "there would be little if any conservation of judicial resources to be had” by deciding only the "clearly established” prong. Pearson, 129 S.Ct. at 818. For instance, it sometimes can be "difficult to decide whether a right is clearly established without deciding precisely what the constitutional right happens to be.” Id. (quotation marks and citation omitted). In other cases, the explanation that a right *773 was not clearly established "may make it apparent that [the allegations] do not make out a constitutional violation at all.” Id.

. We concluded that this alternative rationale was "also unaffected by the Supreme Court's Boumediene decision.” 563 F.3d at 532 n. 5.

. Again, the plaintiffs urge us to "abandon” our holding in Rasul II on this point as well. Appellants’ Br. 35.

. Specifically, the Rasul plaintiffs alleged "they were beaten, shackled in painful stress positions, threatened by dogs, subjected to extreme temperatures and deprived of adequate sleep, food, sanitation, medical care and communication.” Rasul I, 512 F.3d at 654.

. In Rasul II, we stated that we could "see nothing in the Supreme Court's [Boumediene ] decision that could possibly affect our disposition of” the plaintiffs' ATS claims alleging violations of the law of nations and "therefore reinstated] our judgment” with respect to those claims. 563 F.3d at 528-29. The portion of Rasul I that treats the ATS claims, therefore, remains controlling law.

.The plaintiffs also challenge the district court’s holding that the defendants acted within the scope of their employment. They contend that, “[a]s a matter of law, torture can never fall within the scope of employment of the U.S. Secretary of Defense and high-ranking U.S. Army commanders.” Appellants’ Br. 56. They nonetheless recognize the district court's ruling is mandated by our precedent and “maintain the issue here [only] to preserve it.” Id. They "respectfully submit that this Court’s decisions ... in Rasul II and Harbury [v. Hayden, 522 F.3d 413 (D.C.Cir.2008),] are not well-founded and should be reconsidered.” Id. at 57. We are of course bound by circuit precedent. United States v. Carson, 455 F.3d 336, 384 n. 43 (D.C.Cir.2006) (per curiam) (“[W]e are ... bound to follow circuit precedent absent contrary authority from an en banc court or the Supreme Court.”).

. The district court called it the Alien Tort Claims Act (ATCA), 414 F.Supp.2d at 37-38, another name for the ATS. See Estate of Amergi ex rel. Amergi v. Palestinian Auth., 611 F.3d 1350, 1356 n. 5 (11th Cir.2010) ("The [ATS] is also known as the Alien Tort Claims Act (ATCA), and the Alien Tort Act (ATA).” (internal quotation marks omitted)).

. We did not reach the issue on appeal because the plaintiffs did not appeal that part of the district court’s decision. See Rasul I, 512 F.3d at 661 n. 11.

. The plaintiffs claim the statutory violation exception language of the Westfall Act is ambiguous and we must therefore look to legislative history to determine its meaning. Because Sosa issued after the ATS was enacted, the plaintiffs contend, it "does not shed light on what Congress meant to include in the statutory violation exception." Appellants' Br. 53.

. Although the Supreme Court in Sosa stated that "the ATS is a jurisdictional statute creat *777 ing no new causes of action,” it nonetheless concluded "the statute was intended to have practical effect the moment it became law” and explained that the statute's jurisdictional grant "is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time [the ATS was enacted in 1789].” 542 U.S. at 724, 124 S.Ct. 2739. The Court recognized only three violations — violation of safe conducts, infringement of the rights of ambassadors and piracy — but assumed that nothing "categorically precluded federal courts from recognizing a claim under the law of nations as an element of common law.” Id. at 724-25.
At the same time the Court held a new cause of action could be recognized under the ATS, however, it cautioned courts against doing so, noting that a "series of reasons argue for judicial caution when considering the kinds of claims that might implement the jurisdiction conferred by the [ATS].” Id. at 725, 124 S.Ct. 2739. The Court noted that its "general practice has been to look for legislative guidance before exercising innovative authority over substantive law” and stated it "would be remarkable to take a more aggressive role in exercising a jurisdiction that remained largely in shadow for much of the prior two centuries.” Id. at 726, 124 S.Ct. 2739. The Court emphasized "that a decision to create a private right of action is one better left to legislative judgment in the great majority of cases.” Id. at 727, 124 S.Ct. 2739 (citing Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 68, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001); Alexander v. Sandoval, 532 U.S. 275, 286-87, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001)). For that reason, the Court found itself "reluctant to infer ... a private cause of action where the statute does not supply one expressly.” Id. Additionally, "the potential implications for the foreign relations of the United States of recognizing [a new cause of action under the ATS] should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs.” Id.

. In this respect, the ATS is easily distinguishable from section 301(a) of the Labor Management Relations Act of 1947 (LMRA), 29 U.S.C. § 185(a). See Dissenting Op. at 791. Section 301(a) is part of an extensive statutory enactment and, although it speaks only to federal jurisdiction, other provisions of the LMRA establish substantive legal duties and rights. See, e.g., 29 U.S.C. §§ 186-87. The ATS, by contrast, is a stand-alone grant of jurisdiction only.