IKUTA, Circuit Judge,
dissenting, joined by Judges KLEINFELD, CALLAHAN and BEA:
In its rush to announce which decisions of selected international tribunals, which unratified or unenforceable treaties, and which favorite academic theories create international law norms enforceable in federal courts, the majority has stumbled on the *819 threshold question: whether the Alien Tort Statute (ATS) gives us jurisdiction over this particular suit at all. As it happens, this threshold is no mere doorsill but a formidable obstacle: in fact, the ATS gives us no authority to hear a case where an alien sues another alien. That is, Congress enacted the ATS under the authority of the foreign diversity clause, which provides that the federal judicial power extends to controversies between “a State, or the Citizens thereof, and foreign States, Citizens or Subjects,” U.S. Const, art. III, § 2, cl. 1. This means that in enacting the ATS, Congress authorized federal courts to hear actions where an alien sues a U.S. citizen, but gave federal courts no authority to hear suits between two aliens. Because the majority sees fit to brush past these limitations and give itself unlimited authority to adjudicate suits between aliens for torts arising anywhere in the world, I respectfully dissent.[1]
I
The ATS provides that district courts have “original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.” 28 U.S.C. § 1350. To determine whether this language gives a federal court authority to hear a suit between two aliens, it is necessary to revisit basic principles of jurisdiction. In order for a federal court to have jurisdiction over a suit, two criteria must be met: first, Congress must enact a statute granting the court subject matter jurisdiction over that category of suits;[2] and second, Congress’s grant must be within the scope of Article III. It is hornbook law that “Congress may not expand the jurisdiction of the federal courts beyond the bounds established by the Constitution.” Verlinden, B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 491, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983).
Article III allows Congress to give federal courts authority to hear cases that fall into roughly three categories: (1) cases “arising under” the laws of the United States, U.S. Const, art. III, § 2, cl. 1 (“all Cases ... arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority”); (2) cases relating to a specific subject matter, see U.S. Const. art. III, § 2, cl. 2 (“all Cases of admiralty and maritime Jurisdiction”); and (3) cases relating to specific parties, see U.S. Const, art. III, § 2, cl. 2 (“all Cases affecting Ambassadors, other public Ministers and Consuls; ... Controversies to which the United States shall be a party; ... between two or more States; between a *820 State and Citizens of another State; between Citizens of different States; between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects”).
As explained in detail below, the First Congress did not give federal courts authority to hear cases in the first category (cases “arising under” the “Laws of the United States”) when it enacted the ATS, because it neither created a body of federal law nor authorized courts to do so, and international law is not itself part of the “Laws of the United States” for purposes of Article III. The second category (cases relating to admiralty and maritime law) is not applicable here. Rather, it is clear that in enacting the ATS, the First Congress gave courts authority only over cases in the third category: namely, cases between citizens and aliens. This conclusion finds strong support in the contemporaneous history and interpretation of the Constitution and the Judiciary Act of 1789, which created the ATS.
A
The structure for analyzing the scope of a congressional grant of jurisdiction is set forth in Verlinden, which considered a situation analogous to this one. In Verlinden, the Court considered whether Congress had exceeded the scope of Article III in enacting the Foreign Sovereign Immunities Act (FSIA), which, among other things, gives federal courts subject matter jurisdiction over actions by foreign plaintiffs against foreign sovereigns. 461 U.S. at 482, 491, 103 S.Ct. 1962. Verlinden first considered whether the FSIA fell within the scope of the foreign diversity clause. The Court concluded that the foreign diversity clause, which extends the judicial power only to cases between citizens and aliens, was “not sufficiently broad” to give Congress authority to enact the FSIA, id. at 482, 103 S.Ct. 1962, since the foreign diversity clause does not authorize suits between two aliens.
Next Verlinden considered whether Congress’s grant of subject matter jurisdiction in enacting the FSIA was within the scope of the “arising under” clause. The Court posited that if the FSIA were a “purely jurisdictional” statute, i.e., one that seeks to do “nothing more than grant jurisdiction over a particular class of eases,” then Congress could not have conferred jurisdiction on federal courts pursuant to the “arising under” clause. Id. at 496, 103 S.Ct. 1962 (quoting The Propeller Genesee Chief v. Fitzhugh, 53 U.S. (12 How.) 443, 451, 13 L.Ed. 1058 (1852)). This reasoning is obviously correct: a “purely jurisdictional statute” granting jurisdiction over a particular class of cases does not make that particular class of cases arise under federal law any more than the diversity jurisdiction statute, 28 U.S.C. § 1332, makes a $100,000 breach of contract suit between a Massachusetts corporation and a Maine citizen “arise under” federal law. On the other hand, if Congress created a substantive body of federal law in enacting the FSIA, claims invoking that substantive body of law could “arise under” the FSIA, and federal courts could then hear FSIA cases between aliens under the “arising under” clause.
After examining the history and structure of the FSIA, the Court concluded that the FSIA did constitute a body of substantive federal law because: (1) the FSIA was not purely jurisdictional, but rather, “simply one part” of “a broad statutory framework governing assertions of foreign sovereign immunity,” Verlinden, 461 U.S. at 496-97, 103 S.Ct. 1962; (2) in enacting the FSIA, “Congress expressly exercised its power to regulate foreign commerce, along *821 with other specified Article I powers,” id. at 496-97, 103 S.Ct. 1962; and (3) actions under the FSIA would require courts to apply the statute’s substantive law regarding sovereign immunity, id. at 496-97, 103 S.Ct. 1962. Given these three factors, Verlinden concluded that an action against a foreign sovereign invoking the FSIA ‘“arises under’ federal law, within the meaning of Article III.” Id. at 497, 103 S.Ct. 1962. And because cases invoking the FSIA “arise under” federal law, federal courts have jurisdiction to hear FSIA suits between two aliens. Id.
Applying this three-factor analysis to the ATS, it is clear that Congress did not create a body of federal law when it enacted the ATS; rather the ATS falls on the purely jurisdictional side of the divide. First, Sosa v. Alvarez-Machain has told us that the ATS is a purely jurisdictional statute that does nothing but grant federal courts jurisdiction over a species of claims that incorporate “the law of nations.” 542 U.S. 692, 713-14, 729, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004).
Second, in enacting the ATS, Congress did not even purport to exercise its Article I power “to define offenses against the ‘Law of Nations,’ Art. I, § 8, cl. 10,” Verlinden, 461 U.S. at 494 n. 19, 103 S.Ct. 1962, or, for that matter, exercise any of its enumerated Article I powers. Verlinden placed great importance on the fact that Congress expressly exercised its Article I foreign commerce powers in enacting the FSIA by setting forth a comprehensive scheme relating to foreign entities and codifying standards governing foreign relations as an aspect of substantive federal law. Id. at 496-97 & n. 22, 103 S.Ct. 1962. By contrast, in enacting the ATS, a single clause, Congress did not include anything similar. See The Propeller Genesee Chief, 53 U.S. at 451-52 (stating that the lack of congressional intent “to exercise [its] power to regulate commerce” was “evident” from the law’s containing “no regulations of commerce”).
Nor did Congress exercise its Article I powers in enacting the ATS by giving the courts authority to create a body of federal law. Although Verlinden did not address this manner of creating a substantive body of federal law, the Court held in Textile Workers of America v. Lincoln Mills of Alabama, that a facially jurisdictional statute can be a substantive exercise of Congress’s Article I Commerce Clause power where Congress intended the statute to authorize federal courts to fashion a body of federal law for a specific purpose. 353 U.S. 448, 77 S.Ct. 912, 923, 1 L.Ed.2d 972 (1957). But this theory is inapplicable to the ATS: Sosa expressly rejected the view that the ATS was an “authority for the creation of a new cause of action for torts in violation of international law,” 542 U.S. at 713, 124 S.Ct. 2739, and contrasted the federal courts’ limited authority to recognize certain pre-existing international norms pursuant to the ATS with the “express congressional authorization to devise a body of law directly” in Lincoln Mills, id. at 726.[3] See also Mohammed v. Rumsfeld, 649 F.3d 762, 777 n. 25 (D.C.Cir.2011) (“[T]he ATS is easily distinguishable from section 301(a) of the [LMRA]. Section 301(a) is part of an extensive statutory enactment and, although it speaks only to *822 federal .jurisdiction, other provisions of the LMRA establish substantive legal duties and rights. The ATS, by contrast, is a stand-alone grant of jurisdiction only.” (citations omitted)).
Third, unlike the FSIA, the ATS is not a “comprehensive regulatory statute.” Verlinden, 461 U.S. at 497, 103 S.Ct. 1962. Rather than requiring courts to apply any congressionally enacted standards, as in the FSIA, the ATS merely authorizes courts to recognize certain already existing norms. Sosa, 542 U.S. at 732, 124 S.Ct. 2739.
In sum, Verlinden’s three-factor analysis shows that Congress did not create substantive federal law in enacting the ATS, and, as a result, aliens bringing international law tort actions and claiming jurisdiction under the ATS do not, by force of that statute, raise claims that “arise under” federal law for purposes of Article III jurisdiction.
B
As shown above, Verlinden eliminates the argument that international law tort suits between two aliens “arise under” the ATS, and thus forecloses one basis for federal courts to hear suits between aliens. It does not, however, address the related theory that Congress enacted the ATS on the understanding that it fell within the scope of Article Ill’s “arising under” clause because the “law of nations” is part of the “Laws of the United States.” This argument also fails. As explained below, neither the text of the Constitution nor historical evidence supports this theory, and Supreme Court decisions weigh against it.
The interpretation of the phrase “Laws of the United States” in Article III must begin with the language of the Constitution and the intent of the Framers, see United States v. Woodley, 751 F.2d 1008, 1009-10 (9th Cir.1985) (en banc), and nothing in Article III or the Constitution as a whole implies that the reference to “Laws of the United States” in Article III included the “law of nations” within its scope. Indeed, the textual evidence strongly supports the opposite conclusion. Although the Framers used the term “law of nations” in the Constitution for certain purposes, see, e.g., U.S. Const. art. I, § 8 (giving Congress the power “[t]o define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations”), the term is not included in Article III. We generally presume that the inclusion and omission of language in different sections of the same statute is intentional and purposeful, and for the same reason, we should not read “law of nations” into the Article III reference to “Laws of the United States.” Cf. Estate of Bell v. Comm’r, 928 F.2d 901, 904 (9th Cir.1991); Ariz. Elec. Power Coop. v. United States, 816 F.2d 1366, 1375 (9th Cir.1987) (‘When Congress includes a specific term in one section of a statute but omits it in another section of the same Act, it should not be implied where it is excluded.”).
The historical evidence also supports the presumption that the Framers intentionally omitted the “law of nations” from the scope of the judicial power established in Article III. For example, there were suggestions to draft the Constitution so as to extend the judicial power to claims arising under the law of nations, see, e.g., The Federalist No. 80 (proposing that the judicial power extend to “cases arising upon treaties and the laws of nations”), and delegates at the Constitutional Convention considered specific proposals to add such language, see 3 Records of the Federal Convention of 1787 604, 608 (Max Farrand ed., Yale 1911) (quoting the plan placed before the Convention by Charles Pinck *823 ney of South Carolina: “an Appeal shall be allowed from the judicial Courts of the several States in all Causes wherein Questions shall arise on the Construction of Treaties made by U.S.—or on the Law of Nations” (internal quotation marks omitted)); 2 Records at 157 (quoting the plan presented to the Convention by William Paterson of New Jersey: “the Judiciary [shall] have authority to hear and determine ... all Cases ... which may arise ... on the Law of Nations, or general commercial or marine Laws”). Ultimately, however, the delegates chose not to include such a reference in the final draft of Article III, indicating a purposeful decision not to extend the judicial power to the full scope of the law of nations. Instead, they limited the judicial power to specific areas of international law, i.e., admiralty and ambassadors. J. Andrew Kent, Congress’s Under-Appreciated Power to Define and Punish Offenses Against the Law of Nations, 85 Tex. L.Rev. 843, 938 n. 418 (2007).
Taking this textual evidence as a whole, there is no support for an argument that the First Congress, a good number of whom had participated in the Constitutional Convention, see Sosa, 542 U.S. at 730, 124 S.Ct. 2739; Ames v. Kansas, 111 U.S. 449, 464, 4 S.Ct. 437, 28 L.Ed. 482 (1884), understood international law to be part of the “Laws of the United States.” The Framers did not expressly include the “law of nations” in Article III, and the historical evidence weighs against a theory that the Framers implicitly included the “law of nations” in the distinct phrase, “Laws of the United States.”
This reading is confirmed by a series of subsequent Supreme Court decisions establishing that cases presenting questions of international law do not arise under the laws of the United States for purposes of Article III. See Caperton v. Bowyer, 81 U.S. 216, 228, 14 Wall. 216, 20 L.Ed. 882 (1871) (“It is said that [the plea] involves a question of international law. If it does, this can give this court no jurisdiction. The law of nations is not embodied in any provision of the Constitution, nor in any treaty, act of Congress, or any authority, or commission derived from the United States.”); N.Y. Life Ins. Co. v. Hendren, 92 U.S. 286, 286-87, 23 L.Ed.'709 (1875) (holding that the court lacked jurisdiction to hear a case involving “the general laws of war, as recognized by the law of nations applicable to this case,” because “it [was] nowhere appearing that the constitution, laws, treaties, or executive proclamations, of the United States were necessarily involved in the decision”); Am. Ins. Co. v. 356 Bales of Cotton, 26 U.S. 511, 545, 1 Pet. 511, 7 L.Ed. 242 (1828) (“A case in admiralty does not, in fact, arise under the Constitution or laws of the United States.”).[4] Rather, as the majority agrees, *824 the law of nations “was at the time part of the so-called general common law,” which “was not federal law under the Supremacy Clause.” 542 U.S. at 739, 124 S.Ct. 2739 (Scalia, J., concurring in part and concurring in the judgment); Maj. op. at 749.
Because the First Congress did not exercise its Article I powers to create substantive law and did not understand the law of nations to be part of the “Laws of the United States,” it could not have enacted the ATS on the understanding that it fell within the scope of Article Ill’s “arising under” clause. This conclusion does not, however, render the ATS unconstitutional. Congress’s grant of jurisdiction to federal courts under the ATS was within the scope of a different provision of Article III: namely, the “foreign diversity clause,” Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 485 n. 6, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983), which gives federal courts authority to hear cases alleging a tort in violation of the law of nations between a citizen and an alien.
II
That the ATS gave federal courts jurisdiction to consider only suits for “torts committed in violation of the law of nations” brought by aliens against citizens, is well-supported and corroborated by the historical backdrop to Article III and the Judiciary Act, and confirmed by the Supreme Court’s decision in Mossman v. Higginson, 4 U.S. (4 Dall.) 12, 1 L.Ed. 720 (1800). Contemporary Anglo-European legal principles provided that a country had no responsibility under the law of nations to adjudicate suits between two aliens arising abroad, but was obligated to redress injuries its citizens caused to aliens. When the youthful United States enacted the ATS as part of its efforts to discharge these obligations, it had no intention of intruding in other nations’ affairs, thereby giving them just cause for war. Within this historical context, the Supreme Court appropriately interpreted the First Congress’s grant of jurisdiction to federal courts to hear actions involving aliens as limited to suits between aliens and citizens.
A
A review of the legal doctrines prevailing at the time the United States came onto the international scene shows that the well-established rules of Anglo-European “law of nations” required (among other things) that nations provide a means for aliens to redress injuries they received at the hands of citizens. According to Emmerich de Vattel, the most cited scholar in post-Revolution America,[5] injuring a citi *825 zen of another nation was tantamount to harming the foreigner’s sovereign, E. de Vattel, The Law of Nations bk. 2, ch. 6, §§ 71-72, at 136 (Charles G. Fenwick trans., Oceana Publications 1964) (1758) (all citations hereinafter are to bk. 2, ch. 6). Therefore, “a nation had a duty to prevent its citizens from harming not only ambassadors and public ministers whom it received, but all foreign citizens whom it admitted within its borders.” Anthony J. Bellia Jr. & Bradford R. Clark, The Alien Tort Statute and the Law of Nations, 78 U. Chi. L.Rev. 445, 472-73 (2011) (footnote omitted) (emphasis added).
Because even the most developed country cannot prevent all harms to foreigners, see Vattel, § 73, at 136, an injury to an alien did not automatically constitute a violation of the law of nations unless the country approved and ratified the act of its citizen, id. § 74, at 136, either by authorizing it before, id. § 78, at 137, or, more relevant here, by failing to redress it after the fact, id. § 76, at 136-37; see also Blackstone, Commentaries *68 (stating that once the injured nation demanded “satisfaction and justice to be done on the offender,” the failure of the “the state to which he belongs” to provide such relief rendered that state “an accomplice or abettor of [its] subject’s crime,” and drew it into “the calamities of foreign war”). Indeed, a sovereign’s refusal to make amends did “no less a wrong” to the foreign citizen’s nation “than if he injured [that Nation] himself,” Vattel, § 72, at 136, and “gave the [harmed] nation just cause for war,” Bellia & Clark, 78 U. Chi. L.Rev. at 477 & nn. 159-60 (citing Vattel, Burlamaqui, Pufendorf, and Grotius). See Sosa, 542 U.S. at 715, 124 S.Ct. 2739 (“An assault against an ambassador, for example, impinged upon the sovereignty of the foreign nation and if not adequately redressed could rise to an issue of war.” (citing Vattel)); 1 U.S. Op. Atty. Gen. 566, 568-69 (1822) (advising the Secretary of State of his duty to deliver a Danish slave to the minister of Denmark on the ground that “any attempt on the part of the United States, or the individual citizens thereof under the sanction and protection of their government to interfere with Danish regulations [tolerating slavery] would be an invasion of the sovereignty of Denmark, and, if avowed and unredressed on our part, a just cause of war”).
To avoid giving offense or creating a ground for the injured sovereign to declare war, England allowed aliens to sue citizens for injuries to their person or their personal property. An alien could bring a common law action in an English court against a British subject, Bellia & Clark, 78 U. Chi. L.Rev. at 482 (listing assault, battery and false imprisonment among the available actions), and could even sue British subjects in an English court for acts of violence committed outside of England’s territorial jurisdiction, id. at 483.
Suits between aliens for acts occurring in foreign countries raised a different issue, however. For one thing, nations had no duty to adjudicate them. See id. at 484 (explaining that “[u]nder the law of nations, nations declined to exercise jurisdiction over actions that were local to another nation”). For another, providing a forum might itself have offended a foreign sovereign. See Vattel, Law of Nations, bk. 2, ch. 4, § 54, at 131 (“It clearly follows from the liberty and independence of nations, that each has the right to govern itself as it thinks proper, and that no one of them has the least right to interfere in the government of another.”). In fact, Vattel’s explanation that unless permitted by treaty, a “sovereign has the right to treat as enemies those who undertake to interfere in its domestic affairs otherwise than by their good offices,” id. § 57, at 132, dovetails neatly with Chief Justice Marshall’s *826 observation that “the perfect equality of nations” precludes any nation from “imposting] a rule on another,” The Antelope, 23 U.S. (10 Wheat.) 66, 122, 6 L.Ed. 268 (1825).
Because adjudicating non-local suits between two aliens was neither required nor even encouraged by the law of nations, courts did not do it. See, e.g., Mostyn v. Fabrigas, (1774) 98 Eng. Rep. 1021 (K.B.); 1 Cowp. 161 (Lord Mansfield citing the example of an action between two Frenchmen based on a fight in France as an example of a case arising “outside of the British “realm which ought not to be tried anywhere but in the country” where it arose); Vemor v. Elvies (1610), 11 Mor. Diet, of Dec. 4788 (Scot.) (the Scotch Court of Sessions refusing to hear a contract action between two Englishmen that arose entirely outside of Scotland).[6]
B
These principles were very much on the mind of the Framers and the members of the First Congress. Before the Constitution was enacted, the newly formed nation had difficulty meeting its obligation to redress violations of the law of nations. See Sosa, 542 U.S. at 716, 124 S.Ct. 2739 (“The Continental Congress was hamstrung by its inability to ‘cause infractions of treaties, or of the law of nations to be punished.’ ”) (quoting J. Madison, Journal of the Constitutional Convention 60 (E. Scott ed., 1893)). One significant concern was the inability of the federal government to redress injuries to aliens (primarily British nationals) by American citizens.[7] With an eye toward remedying these violations, thereby ensuring that the United States met its obligations under the law of nations, the Continental Congress enacted a resolution imploring states to pass laws protecting foreigners.[8] See Sosa, 542 U.S. at 716,124 S.Ct. 2739 (citing 21 Journals of the Continental Congress 1136-37 (G. Hunt ed., 1912)). Specifically, that resolution recommended that the States “authorise suits ... for damages by the party injured, and for compensation to the United States for damage sustained by them *827 from an injury done to a foreign power by a citizen.” Id. (quoting 21 Journals of the Continental Congress at 1137) (ellipsis in original) (emphasis added) (internal quotation marks omitted).
Only one state (Connecticut) did so, however, see An Act to Prevent Infractions of the Law of Nations, reprinted in 4 Public Records of Connecticut for the Year 1782, 156-57 (Leonard W. Labaree ed., 1942), and it is likely that even its courts declined to exercise jurisdiction over suits between aliens. See Bellia & Clark, 78 U.Chi. L.Rev. at 492 (arguing that Brinley v. Avery, 1 Kirby 25 (Conn.Super.Ct.1786), dismissed a claim between two aliens because “British courts had exclusive jurisdiction of a claim arising between British subjects in British territory”).
Shortly thereafter, the Articles of Confederation yielded to the Constitution. Unlike its predecessor, the Constitution (specifically, Article III) provided the judicial power necessary to redress injuries that could otherwise give offense to foreign nations. First, the Framers vested the Supreme Court with original jurisdiction over “all Cases affecting Ambassadors, other public Ministers and Consuls.” U.S. Const, art. Ill, § 2, cl. 2. Second, they authorized federal courts to hear “all Cases of admiralty and maritime Jurisdiction.” Id. cl. 1. Third, they authorized federal courts to hear cases “between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.” Id.
C
The First Congress addressed these same law of nations concerns in the Judiciary Act of 1789, which created lower federal courts and defined their jurisdiction. See Act of Sept. 24, 1789 (hereinafter “Judiciary Act”), ch. 20, § 13, 1 Stat. 73. In addition to giving the Supreme Court original jurisdiction over cases by or against ambassadors and other public ministers, Judiciary Act § 13, 1 Stat. at 80-81, and giving the district courts jurisdiction over admiralty and maritime cases, id. § 9, 1 Stat. at 77, Congress specified that courts could hear two types of civil cases where aliens were parties. Section 11 gave the circuit courts original jurisdiction over suits where an alien was involved and the amount in controversy exceeded $500. Id. § 11, 1 Stat. at 78 (granting the circuit courts “original,” though non-exclusive, “cognizance ... of all suits of a civil nature at common law or in equity, where the matter in dispute exceeds ... five hundred dollars, and ... an alien is a party”). This provision allowed British creditors owed significant sums by U.S. citizens to bring an action in federal court, thus addressing concerns about biased state courts reluctant to force their citizens to make good on debts owed to British subjects, in violation of the Paris Peace Treaty of 1783. See Definitive Treaty of Peace Between the United States and his Brittanic Majesty, art. IV, U.S.-G.B., Sept. 3, 1783, 8 Stat. 80, 82 (providing that “creditors on either side, shall meet with no lawful impediment to the recovery of the full value in sterling money, of all bona fide debts heretofore contracted”).
Section 9 (the ATS), meanwhile, conferred non-exclusive jurisdiction on the federal courts over “all causes where an alien sues for a tort only in violation of the law of nations or a treaty of the United States,” which gave aliens an additional vehicle for redressing certain torts against them where the damage did not meet the $500 jurisdictional limit of Section 11. Id. § 9, 1 Stat. at 77. Taken together, this series of jurisdictional grants represented a substantial step toward “ vindicating] any incident which, if mishandled by a state court, might blossom into an international crisis.” Tel-Oren v. Libyan Arab *828 Republic, 726 F.2d 774, 782 (D.C.Cir.1984) (Edwards, J., concurring).
D
In interpreting the First Congress’s grant of jurisdiction in Section 11, the Supreme Court’s brief analysis in Moss-man v. Higginson directly addresses the jurisdictional interpretation required in this case. See 4 U.S. (4 Dall.) 12, 1 L.Ed. 720 (1800) (per curiam). Mossman involved an action under Section 11 by British merchants to foreclose their mortgage on certain property that had been seized by state commissioners and sold to third parties. First, the Court stated that Section 11 “can, and must, receive a construction, consistent with the constitution.” Id. Mossman then noted that Section 11 gave federal courts “cognizance of suits ‘where an alien is a party,’” but because “the legislative power of conferring jurisdiction on the federal Courts, is, in this respect, confined to suits between citizens and foreigners,” the Court had to interpret Section 11 so as to limit it to eases between aliens and citizens. See id. (emphasis in original) (“[W]e must so expound the terms of the law, as to meet the case, ‘where, indeed, an alien is one party,’ but a citizen is the other.”). There was no alternative, the Court explained, because there was no other source of subject matter jurisdiction: neither the Constitution nor Congress had given courts jurisdiction over the suit’s specific subject matter. Id. (“Neither the constitution, nor the act of congress, regard, on this point, the subject of the suit, but the parties.”). Because the proceedings below did not state that the defendants (the third party owners of the mortgaged property) were citizens, and because the identity of the parties was “indispensable to the exercise of jurisdiction,” the Court quashed the writ of error.[9]
Although the Supreme Court never had occasion to interpret the jurisdictional scope of Section 9,[10] Mossman’s analysis is equally applicable to that section. Like Section 11, Section 9 gives federal courts jurisdiction over suits where an alien is a party. And like Section 11, neither the Constitution nor Congress gave federal courts an alternative source of jurisdiction for torts “in violation of the law of nations.” As explained in Part I, ATS does not give federal courts jurisdiction to hear international law claims between two aliens pursuant to the “arising under” clause, because the ATS itself is a purely jurisdictional statute that does not make suits between two aliens “arise under” federal law, and because international law is not itself substantive federal law. Because the ATS “can, and must, receive a construction[] consistent with the constitution,” id., federal courts have only one choice: they must, under Mossman, interpret Section 9’s grant of jurisdiction over international law claims as limited to cases between aliens and citizens.[11] See id. Ac *829 cordingly, we lack jurisdiction over plaintiffs’ suit against Rio Tinto.[12]
III
The majority tacitly agrees that the First Congress understood that the law of nations, as part of the general common law, “was not federal law in either the jurisdiction-conferring or supremacy-clause sense.” Maj. op. at 750 (quoting William A. Fletcher, International Human Rights in American Courts, 93 Va. L.Rev. in Brief, 2 (2007) (internal quotation marks omitted)). Likewise, it agrees that the First Congress authorized federal courts to recognize pre-existing international law norms, but not to create a body of federal law, as in Lincoln Mills. See Maj. op. at 749 (“[T]he ATS was enacted to provide jurisdiction to hear claims brought pursuant to causes of action that already existed at common law.” (emphasis added)). Necessarily, then, the majority must agree that the First Congress was acting within the scope of Article Ill’s foreign diversity clause when it granted federal courts jurisdiction over international tort cases.
That should be the end of the analysis, because our authority to hear cases begins and ends with the scope of the congressional grant of jurisdiction. It is well-established that only Congress “has the constitutional authority to define the jurisdiction of the lower federal courts.” Keene Corp. v. United States, 508 U.S. 200, 207, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993). And only Congress has the authority to expand the scope of federal jurisdiction it has granted. See id. at 207, 113 S.Ct. 2035 (“[OJnce the lines are drawn, limits upon federal jurisdiction ... must be neither disregarded nor evaded.” (second alteration in original) (internal quotation marks omitted)). In the absence of congressional action, the judiciary’s extension of its own authority “runs contrary to the established principle that the jurisdiction of the federal courts is carefully guarded against expansion by judicial interpretation, and conflicts with the authority of Congress under Art. Ill to set the limits of federal jurisdiction.” Stoneridge Inv. Partners v. Scientific-Atlanta, 552 U.S. 148, 164-65, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008) (quoting Cannon v. Univ. of Chi, 441 U.S. 677, 746, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (Powell, J., dissenting)) (brackets, citation, and internal quotation marks omitted).
But instead of staying within the jurisdictional boundaries created by Congress in enacting the ATS, the majority contends that the scope of federal court jurisdiction under the ATS has, without any congressional action whatsoever, expanded over time and today extends to claims between two aliens. The majority theorizes that: (1) Sosa must be read “to permit courts to develop the federal common law by incorporating into it certain claims that derive *830 from norms of international law,” Maj. op. at 751; (2) such federal court pronouncements then “become federal common law,” Maj. op. at 751; (3) “claims premised on federal common law arise under the law of the United States,” Maj. op. at 750-51 (citing Illinois v. City of Milwaukee, 406 U.S. 91, 100, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972)); and therefore, (4) federal courts have jurisdiction to hear claims invoking international law norms because such claims “arise under the federal common law,” Maj. op. at 753. In sum, the majority contends that after City of Milwaukee, “judicially created federal rule[s] based on international norms,” Sosa, 542 U.S. at 745 n. *, 124 S.Ct. 2739 (Scalia, J., concurring in part and concurring in the judgment), do arise under the “Laws of the United States” for purposes of Article III, and therefore the ATS gives us authority to hear such claims.
But the majority’s ahistorical theory leaps over a crucial step: whether Congress intended the ATS to give us such authority. Because the First Congress enacted the ATS within the scope of the foreign diversity clause, our jurisdiction extends no further. It is therefore irrelevant whether after City of Milwaukee, Congress could have enacted the ATS within the scope of the Article III “arising under” clause so as to give federal courts jurisdiction over international law tort suits between aliens. Congress did not do so in 1789, and no subsequent congressional act has modified the ATS to authorize courts to hear such claims.
Absent such a statutory grant of authority, federal courts lack jurisdiction over international law tort suits between aliens. As previously explained, the “constitutional power” to decide a case “is merely the first hurdle that must be overcome in determining that a federal court has jurisdiction over a particular controversy.” Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 372, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978). The second, and equally significant, hurdle is congressional authorization, “[f]or the jurisdiction of the federal courts is limited not only by the provisions of Art. Ill of the Constitution, but also by Acts of Congress.” Id. And Congress has provided no such grant of jurisdiction either in the ATS or otherwise.
The majority concedes that the federal question statute (28 U.S.C. § 1331) does not authorize jurisdiction over international law tort suits, see Maj. op. at 750-51; indeed, the majority cannot avoid this concession, given Sosa’s out of hand rejection of the theory, see 542 U.S. at 731 n. 19,124 S.Ct. 2739. Dissenting in Sosa, Justice Scalia argued that by authorizing federal courts to “recognize” certain international law norms, the majority made the ATS superfluous, because “judicially created federal rule[s] based on international norms” are federal common law and therefore “ ‘arise under’ the laws of the United States, not only for purposes of Article III but also for purposes of statutory federal-question jurisdiction.” 542 U.S. at 745 n. *, 124 S.Ct. 2739 (Scalia, J., concurring in part and concurring in the judgment) (citing City of Milwaukee, 406 U.S. at 99-100, 92 S.Ct. 1385). In its rejoinder, the Sosa majority brushed aside Justice Scalia’s concern. Congress, it explained, did not intend for § 1331 to be a vehicle for recognizing international law norms; as such, § 1331 did not authorize federal courts to do so.[13] See id. at 731 n. 19,124 S.Ct. 2739 *831 (majority opinion) (finding “no reason to think that [statutory] federal-question jurisdiction was extended” subject to the “congressional assumption” that § 1381 would permit courts to “exercise jurisdiction by entertaining some common law claims derived from the law of nations”).
Sosa’s analysis of congressional intent with respect to § 1331 is equally applicable here: because Congress did not, as the majority supposes, enact the ATS with the intention of allowing federal courts to hear “federally incorporated international law claims” between aliens, we lack the authority to do so. As a result, neither § 1331 nor the ATS nor any other congressional enactment identified by the majority, gives us jurisdiction over such claims.
This conclusion resolves the jurisdictional question raised by this appeal, and it is not necessary to reach the constitutional question raised by the majority’s theory, namely, whether after City of Milwaukee, international law tort claims fall within the scope of Article III “arising under” jurisdiction. But in light of the foregoing analysis, the majority’s conclusion is doubtful. For one thing, Caperton and Hendren held that international law claims, unmoored from any treaty or congressional enactment, do not arise under the Constitution or federal law; and these cases remain good law. See Hendren, 92 U.S. at 286-87; Caperton, 81 U.S. at 228. For another, the majority has not cited a single case in which the Court based its jurisdiction on a judicially created rule with international law implications. Even in the area of international relations, in which the Court has “assumed competence to make judicial rules of decision of particular importance to foreign relations,” Sosa, 542 U.S. at 726, 124 S.Ct. 2739 (citing Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964)), the Court did not base its jurisdiction on those rules. See, e.g., Am. Ins. Ass’n v. Garamendi, 539 U.S. 396, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003) (42 U.S.C. § 1983, World War II treaties); First Nat’l City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 615, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) (diversity statute); Pfizer, Inc. v. Government of India, 434 U.S. 308, 309, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978) (Sherman Act); Sabbatino, 376 U.S. at 424, 84 S.Ct. 923 (diversity statute).
Historical evidence also weighs against the majority’s theory: the Framers did not extend the judicial power generally to claims arising under the law of nations, but rather expressly enumerated the components of the law of nations (international law and admiralty law) to which the judicial power would extend. See section I.B, supra. Indeed, suits between aliens may well be the only category of international tort claims not itemized in Article III, which covers suits between aliens and citizens (via the diversity clause), incidents offending ambassadors (“Cases affecting Ambassadors, other public Ministers and Consuls,” U.S. Const, art. Ill, § 2, cl. 1), and acts of piracy (“admiralty and maritime Jurisdiction,” id.).
Despite the clear-cut limitations on the scope of our jurisdiction under the ATS, the majority claims that Sosa itself authorized this expansion of our jurisdiction to hear claims between aliens. The majority bases this conclusion on three variations *832 on the theme that Sosa held, sub silentio, that federal courts may hear claims between aliens. First, it notes that Alvarez-Machain v. United States, 331 F.3d 604 (9th Cir.2003) (en banc), rev’d sub nom., Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), “applied” Marcos I, where we held that Congress gave federal courts subject matter jurisdiction over a suit between two aliens, see In re Estate of Ferdinand E. Marcos Human Rights Litig. (Marcos I), 978 F.2d 493, 502-03 (9th Cir.1992). Maj. op. at 749-50. While acknowledging that Sosa reversed Alvarez-Machain, the majority contends that “it did so on unrelated grounds,” and “the best reading of Sosa is that it confirms our circuit law on this point.” Maj. op. at 750. Second, the majority argues that by failing to mention two amicus briefs arguing that the Court lacked jurisdiction to hear a suit between two aliens, Sosa necessarily determined that suits between aliens fall within the ATS. See Maj. op. at 751-52. And third, the majority contends that Sosa’s warning to federal courts to be wary of “the potential implications for the foreign relations of the United States of recognizing” claims involving “the power of foreign governments over their own citizens,” 542 U.S. at 727, 124 S.Ct. 2739, presupposes that federal courts have subject matter jurisdiction over those claims. Maj. op. at 752-53.
These three arguments fail for the same reason: the Supreme Court has been absolutely clear that its assumption of jurisdiction without discussion has no precedential effect. See Ariz. Christian Sch. Tuition Org. v. Winn, — U.S. —, 131 S.Ct. 1436, 1448-49, 179 L.Ed.2d 523 (2011); Rasul v. Bush, 542 U.S. 466, 496-97, 124 S.Ct. 2686, 159 L.Ed.2d 548 (2004) (“Of course ‘the existence of unaddressed jurisdictional defects has no precedential effect.’ ” (quoting Lewis v. Casey, 518 U.S. 343, 352 n. 2, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996))); United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 38, 73 S.Ct. 67, 97 L.Ed. 54 (1952) (“[T]his Court has followed the lead of Chief Justice Marshall who held that this Court is not bound by a prior exercise of jurisdiction in a case where it was not questioned and it was passed sub silentio.”). It is apparent that neither Sosa’s failure to mention our erroneous jurisdictional holding in overruling Alvarez-Machain, nor its failure to address an argument amounting to a half page in two amicus briefs, among 21 such briefs comprising over 360 pages in the aggregate,[14] is binding on us or the Court.
Indeed, Sosa had no reason to address the Article III issues lurking in the background, because the tort claims against Sosa shared a common nucleus of operative fact with his original and jurisdiction-ally unproblematic claims against the United States under the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1), and the DEA agents under the diversity statute, see 28 U.S.C. § 1332(a)(2). See Alvarez-Machain v. United States, 107 F.3d 696, 699-700 (9th Cir.1996). As such, the district court could have exercised supplemental jurisdiction over the balance of Sosa’s claims, see 28 U.S.C. § 1367(a), and the Court could have reviewed the entire case as it would any other final judgment, see 28 U.S.C. § 1254(1); see also United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Had the jurisdictional question been squarely before it, Sosa would have been obliged to grapple with this complex and difficult is *833 sue. The majority’s suggestion that Sosa silently brushed off this jurisdictional concern is unreasonable and foreclosed by Supreme Court precedent.[15] Rather than being empowered by the silence of Sosa, the majority is in fact constrained by the Supreme Court’s express statements and reasoning in Mossman, which make clear that Section 9, like Section 11, gives federal courts jurisdiction only over suits between an alien and a citizen. Mossman has never been overruled, and we are bound by it. See Agostini v. Felton, 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997).
In sum, the majority has failed to identify any basis for exercising jurisdiction over this suit between two aliens. All it has to rely on is its own pronouncement of jurisdiction.
IV
The First Congress was careful. It drafted the Judiciary Act to provide courts with jurisdiction in those cases that would help the nation avoid giving offense to foreign nations. But it limited this grant of jurisdiction to prevent courts from meddling in a foreign sovereign’s affairs in a manner that would engender the very offense that the First Congress sought to avoid.
The majority fails to show the same wisdom. Proving that the judiciary lacks the “aptitude” for decisions pertaining to foreign policy, Chicago & S. Air Lines v. Waterman S.S. Corp., 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948), the majority accords itself the power to hear virtually any claim by an alien against other aliens for torts anywhere in the world, despite the obvious potential for working the types of mischief the Framers aimed to avoid. See Br. of the Governments of the United Kingdom of Great Britain and Northern Ireland and the Commonwealth of Australia as Amici Curiae in Supp. of Defs-Appellees/Cross-Appellants 1 (arguing that they have long maintained “their opposition to overly broad assertions of any extraterritorial civil jurisdiction arising out of aliens’ claims for alleged injuries sustained abroad ... [which] is based on their concern that such exercises of jurisdiction are contrary to international law and create a substantial risk of jurisdictional conflicts”). See also Government of Switzerland, Aide Memoire (2007) (stating, in opposition to the Second Circuit’s decision in Khulumani v. Barclay Nat. Bank. Ltd., 504 F.3d 254 (2nd Cir.2007), that “a broad assertion of jurisdiction to provide civil remedies for violations perpetrated by foreign corporations against aliens in foreign places is inconsistent with international law and may indeed undermine efforts to promote human rights and their protection”), reprinted in Br. for the United States as Amicus Curiae in Supp. of Petitioners app. C at 7a-8a, Am. Isuzu Motors, Inc. v. Ntsebeza, 553 U.S. 1028, 128 S.Ct. 2424, 171 L.Ed.2d 225 (2008) (mem.) (No. 07-919).
Even more concerning, however, is that the majority has not placed any limit on how it will select and apply rules of international law. Without legislative direction or even a legal framework, the majority announces in conclusory fashion that “international law” recognizes both corporate liability and aiding and abetting liability, *834 and that plaintiffs’ complaints allege the elements (as selected by the majority from sources of varying weight) of two of plaintiffs’ international law causes of action. In adopting this idiosyncratic approach, the majority pays lip service to, but fails to heed, Sosa’s warning that federal courts should exercise restraint and “not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted.” 542 U.S. at 732, 124 S.Ct. 2739.
The dangers created by the majority’s method of creating (or “recognizing”) international rules of law, to say nothing of their application to foreign nationals suing one another in federal court, are obvious. I dissent from this ill-conceived, ill-reasoned, and, I fear, ill-fated exercise of judicial power.

. The majority is correct that neither party raised this jurisdictional issue. See Maj. op. at 743. Its account is incomplete, however: five judges voted to request supplemental briefing on this issue, but in a surprising and unprecedented decision, six judges voted against obtaining the parties' input on this issue. Nevertheless, we must address this key jurisdictional concern sua sponte, even without the benefit of the parties’ briefing on this issue. See Travelers Indem. Co. v. Bailey, 557 U.S. 137, 129 S.Ct. 2195, 2205-06, 174 L.Ed.2d 99 (2009) (“[Federal courts] are courts with authority, when parties are brought before them in accordance with the requirements of due process, to determine whether or not they have jurisdiction to entertain the cause and for this purpose to construe and apply the statute under which they are asked to act.” (alteration in original) (quoting Chicot Cnty. Drainage Dist. v. Baxter State Bank, 308 U.S. 371, 376, 60 S.Ct. 317, 84 L.Ed. 329 (1940)) (internal quotation marks omitted)).

. There is only one exception to this rule, not applicable here: Article III of the Constitution gives the Supreme Court original jurisdiction over cases involving ambassadors and suits involving states as parties. See U.S. Const, art. Ill, § 2, cl. 2.

. Sosa's holding that the ATS "gave the district courts 'cognizance' of certain causes of action ... not power to mold substantive law," 542 U.S. at 713, 124 S.Ct. 2739 (emphasis added), is reinforced by its consistent use of "recognize” and "entertain.” See, e.g., id. at 714, 124 S.Ct. 2739 ("[Fjederal courts could entertain claims once the jurisdictional grant was on the books, because torts in violation of the law of nations would have been recognized within the common law of the time.”); id. at 724, 124 S.Ct. 2739 (First Congress "understood that the district courts would recognize private causes of action”).

. The majority does not dispute that admiralty law is a significant part of the law of nations, see Sosa, 542 U.S. at 715, 124 S.Ct. 2739; United States v. Flores, 289 U.S. 137, 148, 53 S.Ct. 580, 77 L.Ed. 1086 (1933), and that admiralty cases do not arise under the Laws of the United States, see Bales of Cotton, 26 U.S. at 545. These holdings support the conclusion that cases presenting questions of international law (such as admiralty cases) do not arise under the “Laws of the United States” for purposes of Article III. The majority attempts to refute this logic by arguing that admiralty law has been "carved out by the Supreme Court as special ... for reasons wholly inapplicable to claims cognizable under the ATS.” Maj. op. at 754 (citing Romero v. Int’l Terminal Operating Co., 358 U.S. 354, 359-80, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959)). But Romero's holding that Congress did not intend federal courts to hear admiralty law claims under § 1331, 358 U.S. at 378-80, 79 S.Ct. 468, did not overrule 356 Bales of Cotton, and indeed sheds no light on whether admiralty law is part of the "Laws' of the United States” for purposes of Article Ill’s “arising under” clause. See Verlinden, 461 *824 U.S. at 494, 103 S.Ct. 1962 (noting that the "Court never has held that statutory 'arising under’ jurisdiction is identical to Article III 'arising under' jurisdiction,” despite the identical language in Article III and § 1331).

. See U.S. Steel Corp. v. Multistate Tax Comm’n, 434 U.S. 452, 462 n. 12, 98 S.Ct. 799, 54 L.Ed.2d 682 (1978) (citing 1 J. Kent, Commentaries on American Law 18 (1826)) ("The international jurist most widely cited in the first 50 years after the Revolution was Emmerich de Vattel.”); Douglas J. Sylvester, International Law as Sword or Shield? Early American Foreign Policy and the Law of Nations, 32 N.Y.U. J. Int’l L. & Pol. 1, 67 (1999) (explaining that in the 2 decades after the Revolution, American judicial decisions cited to Pufendorf, 9; Grotius, 16; Bynkershoek, 25; and Vattel, a "staggering” 92 times). Indeed, in 1775, "Benjamin Franklin acknowledged receipt of three copies of a new edition, in French, of Vattel’s Law of Nations and remarked that the book ‘has been continually in the hands of the members of our Congress now sitting.’ ” U.S. Steel Corp., 434 U.S. at 462 n. 12, 98 S.Ct. 799 (italics added) (quoting 2 F. Wharton, United States Revolutionary Diplomatic Coirespondence 64 (1889)).

. Early decisions in the United States echoed this rule. See Molony v. Dows, 8 Abb.Pr. 316 (N.Y.Sup.1859) ("[N]o case will be found in the whole course of English jurisprudence in which an action for an injury to the person, inflicted by one foreigner upon another in a foreign country, was ever held to be maintainable iii an English court.”); Willendson v. Forsoket, 29 F.Cas. 1283, 1284 (D.C.Pa.1801) (No. 17,682) (stating the general rule that courts ought “not to take cognizance of disputes between the masters and crews of foreign ships,” and should instead refer "them to their own courts”).

. In fact, some Americans even worried about acts of violence against British nationals. See Bellia & Clark, 78 U. Chi. L.Rev. at 501 (noting that the president of the Continental Congress, Elias Boudinor, feared that "postwar acts of violence by New York Whigs against the British were so extreme as possibly to 'involve us in another war' ”).

. Although not directly relevant to the civil suits at issue here, the Marbois incident of May 1784, in which a French citizen assaulted the Secretary of the French Legion in Philadelphia, was also instrumental in highlighting the young nation’s inability to redress criminal acts against ambassadors. While the perpetrator was ultimately prosecuted for a criminal violation of the law of nations in state court, see Respublica v. De Longchamps, 1 U.S. (1 Dall.) 111, 1 L.Ed. 59 (Pa.O. & T. 1784), the incident prompted the French minister to threaten to leave Pennsylvania “unless the decision on Longchamps Case should give them full satisfaction.” Sosa, 542 U. S. at 717 n. 11, 124 S.Ct. 2739 (quoting Letter from Samuel Hardy to Gov. Benjamin Harrison of Virginia, June 24, 1784, in 7 Letters of Members of the Continental Congress 558, 559 (E. Burnett ed., 1934)) (internal quotation marks omitted). In addition to enacting the ATS, Congress addressed these issues in the Judiciary Act, giving federal courts jurisdiction over acts involving ambassadors.

. Lower courts had likewise earlier interpreted Section 11 as being limited to suits between an alien and a citizen. See Fields v. Taylor, 9 F.Cas. 41 (C.C.D.Mass.1799) (No. 4777) (federal circuit court refusing to exercise § 11 jurisdiction over a claim between two British subjects on notes executed in England); Walton v. McNeil, 3 Mass. 25, 29 F. Cas. 141 (C.C.D.Mass.1794) (No. 17,134) (federal circuit court refusing to exercise jurisdiction over suit by one Quebec inhabitant against another on a promissory obligation arising in Canada).

. There are only two cases interpreting Section 9 contemporaneously, and neither case addressed the question whether the ATS granted jurisdiction over suits between aliens, see Bolchos v. Darrel, 3 F.Cas. 810 (No. 1,607) (D.S.C.1795); Moxon v. The Fanny, 17 F.Cas. 942 (No. 9,895) (D.Pa.1793).

. The D.C. Circuit has recognized that this construction more faithfully reflects the First Congress’s intent than does the majority's alternative interpretation that Congress gave courts jurisdiction over suits between aliens.
*829 See, e.g., Doe v. Exxon Mobil Corp., 654 F.3d 11, 77 (D.C.Cir.2011) (Kavanaugh, J., dissenting) ("It would be very odd to think that the Congress of 1789 wanted to create a federal tort cause of action enforceable in U.S. court for, say, a Frenchman injured in London.”); id. at 27 (majority) ("[I]n deeming 'very odd' that the First Congress would be interested in protecting 'a Frenchman injured in London,’ the dissent ignores that the calculus can change where a U.S. citizen is a cause of the harm.” (internal citation omitted)).

. Because I conclude that Congress did not give us jurisdiction to hear cases between two aliens, I agree with Judge Kleinfeld that the ATS does not confer universal jurisdiction on the federal courts. I also agree with Judge Bea that the district court misapplied the standard we set out in Sarei v. Rio Tinto, PLC, 550 F.3d 822 (9th Cir.2008) (en banc), regarding prudential exhaustion.

. Although Sosa did not provide the basis for its conclusion regarding congressional intent, it is supported by the historical record. Enacted without substantial debate in 1875, § 1331 "was designed to provide a statutory basis for the exercise of federal question jurisdiction provided for in Article III.” Curtis Bradley, Jack L. Goldsmith & David H. *831 Moore, Sosa, Customary International Law, and the Continuing Relevance of Erie, 120 Harv. L.Rev. 869, 912 (2007). Because in 1875 the law of nations was understood to be "nonfederal general common law,” rather than “laws of the United States,” see section I.B, supra, Congress could not have enacted § 1331 “on the understanding that federal courts would be able to hear [international law—]based claims pursuant to § 1331’s jurisdictional grant.” Bradley et al., 120 Harv. L.Rev. at 913.

. The amicus briefs quoted by the majority represent an anemic .074 percent of the 20,-357 lines in Sosa’s 21 amicus briefs.

. The majority’s assertion that courts and scholars "agree” that Sosa "necessarily implies” that customary international law is jurisdiction-conferring, Maj. op. at 750, 753, is wrong. Rather, the scope and meaning of the ATS remain hotly disputed. Compare Maj. op. at 752-53, 753-54 with, e.g., Bradley et al., 120 Harv. L.Rev. 869; Eugene Kontorovich, Implementing Sosa v. Alvarez-Machain: What Piracy Reveals About the Limits of the Alien Tort Statute, 80 Notre Dame L.Rev. Ill (2004).